**MALONE & HYDE, INC., and Subsidiaries, Petitioner–Appellee,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellant.**

No. 94–1607.

United States Court of Appeals, Sixth Circuit.

Argued June 15, 1995.

Decided Aug. 18, 1995.

John M. Bixler (argued and briefed), Kevin L. Kenworthy, Bruce Alan Cohen, Miller & Chevalier, Washington, DC, for petitioner-appellee.

John A. Dudeck, David I. Pincus (argued), Gary R. Allen, Acting Chief, (briefed), U.S. Dept. of Justice, Appellate Section Tax Division, Washington, DC, for respondent-appellant.

Before: LIVELY, NELSON, and SILER, Circuit Judges.

LIVELY, Circuit Judge.

In this case the Commissioner of Internal Revenue assessed an income tax deficiency against a corporate taxpayer based on the Commissioner's denial of a portion of a claimed deduction for insurance premiums paid by the corporation to a wholly-owned insurance subsidiary. The United States Tax Court reversed the Commissioner's determination in part, allowed the deduction in issue here, and directed a recomputation of

the corporation's income tax liability for the years in question.

## I.

The facts were stipulated.

In the mid–1970s, Malone & Hyde, a Tennessee corporation engaged in the wholesale food distribution business, began to look for less expensive insurance coverage for itself and its operating subsidiaries. After contacting an independent consulting firm in the business of developing and managing captive insurance programs, Malone & Hyde decided to create an insurance subsidiary to reinsure selected risks. In 1977 Malone & Hyde established a wholly-owned Bermuda insurance subsidiary, Eastland Insurance, Ltd. (Eastland), to provide reinsurance for itself and its subsidiaries.

Eastland was capitalized at $120,000 when Malone & Hyde purchased all 120,000 shares of common stock issued by Eastland at $1 par value. This capitalization met the minimum requirements of Bermuda law. Eastland's officers and directors, who also served as Malone & Hyde's officers, determined that the initial activity of the company would only include reinsurance of the risks of Malone & Hyde and its subsidiaries. During the years in question, Eastland did not insure the risks of any unrelated third party.

After incorporating Eastland to provide reinsurance services, Malone & Hyde selected Northwestern National Insurance Company (Northwestern), a large casualty insurance company located in Milwaukee, Wisconsin, as its primary insurer. On July 1, 1978, Malone & Hyde obtained from Northwestern a master insurance policy for itself and its wholly-owned operating subsidiaries and divisions covering workers' compensation, automobile liability, and general liability.

By prearrangement, on July 11, 1978, Eastland executed a reinsurance agreement with Northwestern. The agreement provided that Malone & Hyde and its subsidiaries and divisions insured their risks with Northwestern, and Northwestern in turn reinsured the first $150,000 of coverage per claim with Eastland. Under the terms of the reinsurance agreement, Eastland provided North-

western with an irrevocable letter of credit dated June 23, 1978, in the amount of $250,-000 to cover any amounts unpaid under the reinsurance agreement. At this time, Eastland had no assets other than its paid-in capital of $120,000. The letter of credit was amended in February of 1980 to increase the amount to $600,000, effective as of January 1, 1980.

In consideration for the policies issued in favor of it by Northwestern, Malone & Hyde executed "hold harmless" agreements in favor of Northwestern in July and October of 1978. Under these documents, Malone & Hyde agreed that in the event Eastland defaulted on its obligations as reinsurer of Northwestern, Malone & Hyde would shield Northwestern completely from any liability.

During the tax years 1979 and 1980, Malone & Hyde paid Northwestern $2,613,354 and $3,047,507 respectively, for insurance coverage and then charged the subsidiaries for their shares of the premiums. After retaining amounts for commissions, taxes, and third-party reinsurance premiums, Northwestern paid Eastland a reinsurance premium of $1,982,369 for the tax year 1979 and $2,343,648 for the tax year 1980. During 1979 and 1980, the insurance provided to Malone & Hyde covered 1,782 and 1,836 vehicles respectively. The workers' compensation insurance covered 6,700 to 7,100 employees, and the general liability insurance covered all the physical facilities owned and operated by Malone & Hyde and its subsidiaries and divisions.

Northwestern determined the overall premiums to be charged to Malone & Hyde based on actuarial methods and information provided by the company. The risk management department of Malone & Hyde's subsidiary, Hyde Insurance Agency, Inc., determined the internal allocation of these overall premiums among Malone & Hyde's various subsidiaries and divisions, based primarily on past premiums and losses for the preceding three years. The total amounts billed to and paid by the eight subsidiaries for insurance were $172,413 for 1979 and $218,900 for 1980. This allocation method had been in use for several years before Eastland was formed.

Malone & Hyde filed consolidated tax returns with the eight insured subsidiaries for the years 1979 and 1980. The company claimed deductions for the entire insurance premiums paid by Malone & Hyde to Northwestern. On audit, the Commissioner disallowed all premiums paid by Malone & Hyde to Northwestern which Northwestern in turn paid to Eastland as reinsurance premiums. The disallowed reinsurance premiums totaled $2,002,393 for tax year 1979 and $2,367,321 for 1980. Malone & Hyde contested the disallowance in the tax court.

## II.

The tax court issued two decisions in this case, the second decision following a motion for reconsideration.

Following a trial on November 20, 1986, the tax court held that Malone & Hyde was not entitled to deduct as business expenses under section 162 of the Internal Revenue Code of 1954 (I.R.C.), 26 U.S.C. § 162(a), those portions of the amounts it paid to Northwestern as insurance premiums that were in turn paid ("ceded") by Northwestern to Eastland as reinsurance premiums.

Malone & Hyde filed a motion for reconsideration and requested permission to supplement the record on the "brother-sister" issue in light of *Humana, Inc. v. Commissioner*, 881 F.2d 247 (6th Cir.1989), *rev'g in part and aff'g in part*, 88 T.C. 197, 1987 WL 49269 (1987). In *Humana*, deciding the brother-sister issue for the first time, this court held that insurance premiums paid to a captive insurance subsidiary on behalf of the parent's other subsidiaries were deductible as ordinary and necessary business expenses. Although Malone & Hyde did not raise the brother-sister issue at the original trial, the tax court granted Malone & Hyde's Motion for Supplementation of Findings and Reconsideration of Opinion. A further trial took place on June 26, 1990. In the second trial, the taxpayer argued that the instant case fell squarely within the *Humana* holding. The Commissioner argued in response that a number of factors in the present case (the hold harmless agreements, the irrevocable letters of credit, and Eastland's thin capitali-

zation) distinguished this case from *Humana*.

In a supplemental opinion on December 14, 1993, the tax court ruled in favor of Malone & Hyde on the brother-sister issue. The tax court outlined a three-part test for determining whether a transaction involved "insurance" for income tax purposes: (1) whether the transaction involves "insurance risks"; (2) whether there is risk shifting and risk distribution; and (3) whether there is "insurance" in its commonly accepted usage. (JA at 99)

First, the tax court held that the Malone & Hyde subsidiaries faced real insurance risks. Second, in determining whether the subsidiaries transferred these risks to Eastland, the tax court concluded that it was required under *Humana* to "look only at the insured's assets and the impact that a claim of loss would have on them." (JA at 107) The tax court held that the subsidiaries transferred their insurance risks because "their financial obligations regarding sustained losses ended with payment of their insurance premiums." (JA at 107)

Because the *Humana* balance sheet test looked only to the insured subsidiaries' assets, the tax court reasoned that the existence of the hold harmless agreements and the letters of credit in this case did not change its decision. The court concluded that, from the subsidiaries' perspective, these agreements provided additional assurance that their insured losses would be paid. The court did not accept the Commissioner's argument that Eastland's thin capitalization demonstrated the lack of real risk shifting, finding that Eastland's capitalization met Bermuda's minimum requirements. The court went on to reason that the separate corporate status of Eastland could not be disregarded in the name of "economic reality" or "substance over form" absent a finding of sham or lack of business purpose. Additionally the court concluded that there were a sufficient number of subsidiaries insuring risks to achieve adequate risk distribution in this case.

Finally, the court found the third prong of its test met since the agreements between the subsidiaries and Eastland constituted in-

surance in the commonly accepted sense. Consequently, the tax court held that under the reasoning of *Humana*, the insurance payments indirectly made by Malone & Hyde's operating subsidiaries to their sibling Eastland were deductible as insurance premiums under § 162(a). The Commissioner appealed this decision.

### III.

Section 162(a) of the Internal Revenue Code creates a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." The tax court's determination that payments paid by Malone & Hyde and its subsidiaries to Eastland were ordinary and necessary business expenses is subject to *de novo* review. *Humana*, 881 F.2d at 251; *Rose v. Commissioner*, 868 F.2d 851, 853 (6th Cir.1989) (holding that a court "review[s] *de novo* the legal standard applied by the tax court in determining whether or not a transaction is a sham").

■ Typically, premiums paid by a business for insurance are considered deductible business expenses. Treas.Reg. § 1.162–1(a) (1954); *Humana*, 881 F.2d at 251. In contrast, sums set aside for the payment of anticipated losses through reserves or otherwise, as a plan for self-insurance, are not deductible business expenses.

The term "insurance" is not defined in the Internal Revenue Code. However, the Supreme Court in *Helvering v. Le Gierse*, 312 U.S. 531, 61 S.Ct. 646, 85 L.Ed. 996 (1941), established a test for identifying insurance for federal income tax purposes. Under the *Le Gierse* test, unless the transaction involves both "risk shifting" (from the insured's perspective) and "risk distribution" (from the insurer's perspective), it is not insurance for the purposes of the Internal Revenue Code. *Id.* at 539, 61 S.Ct. at 649. Risk shifting involves the transfer from the insured to the insurer of one or more risks which present uncertainty. *Humana*, 881 F.2d at 251. We are not concerned in this case with the element of risk distribution; the Commissioner only contests the finding that there was risk shifting.

Although *Le Gierse* involved estate taxes, courts generally have based their decisions in cases involving liability insurance furnished by captive subsidiaries upon the *Le Gierse* approach. See, *e.g.*, *Gulf Oil Corp. v. Commissioner*, 914 F.2d 396, 411 (3d Cir.1990); *Stearns–Roger Corp. v. United States*, 774 F.2d 414, 415 (10th Cir.1985); *Carnation Co. v. Commissioner*, 640 F.2d 1010, 1012 (9th Cir.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381 (1981). But see *Sears, Roebuck and Co. v. Commissioner*, 972 F.2d 858, 861, 863 (7th Cir.1992) (In *Le Gierse* "[t]he Court was not writing a definition for all seasons and had no reason to...").

In *Humana*, 881 F.2d at 247, this court applied the Supreme Court's test in *Le Gierse* to determine the deductibility of insurance premiums paid by a parent corporation and its operating subsidiaries to a captive insurance subsidiary. The *Humana* court concluded that, based on the facts of that case, risk shifting was present in the "brother-sister" situation since the premiums paid by the insured subsidiaries sufficiently insulated them from the insured-against risks.

### IV.

In this case the tax court reached a different conclusion in its second decision solely on the basis of the intervening decision in *Humana*. The basic reasoning of its two decisions concerning the elements of "insurance" was unchanged; the different result in the second decision related only to the "brother-sister" relationship between the insurance subsidiary (Eastland) and Malone & Hyde's other subsidiaries. Thus, we examine the *Humana* decision and then discuss the parties' arguments.

### A.

At the time of its dispute with the Internal Revenue Service, Humana Inc. (Humana) and its subsidiaries operated an extensive chain of for-profit hospitals in the United States and abroad. The insurance coverage of the hospitals operated by both the parent company and its subsidiaries was cancelled. In order to obtain protection, Humana incorporated Health Care Indemnity, Inc. (HCI)

as a Colorado captive insurance company. Together, Humana and a non-operating subsidiary purchased stock in HCI for $1 million. HCI was treated, for tax purposes, as a wholly-owned subsidiary of Humana. HCI provided insurance coverage to Humana and its subsidiaries, and Humana paid to HCI premiums for the insurance coverage afforded hospitals operated by Humana and its subsidiaries. Humana allocated and charged to the subsidiaries portions of the premiums it paid to HCI representing the share each bore for the hospitals operated. Humana claimed the total amounts paid to HCI as an ordinary and necessary business deduction on its consolidated income tax returns. *Humana*, 881 F.2d at 248–49. After the Commissioner denied the deductions and assessed deficiencies for the years 1976–1979, Humana filed suit in the tax court, which upheld the Commissioner's determination.

On appeal this court determined that the payments made by Humana to HCI for its own coverage did not constitute insurance premiums. *Id.* at 251–52. With respect to the payments made to HCI for coverage provided to Humana's operating subsidiaries, however, the court determined that there had been "risk shifting" under *Le Gierse* and that Humana was entitled to deduct the amounts charged to these subsidiaries under § 162(a). The court rejected the "economic family"[1] theory relied upon by some courts and explicitly adopted the approach used in *Clougherty Packing Co. v. Commissioner*, 811 F.2d 1297 (9th Cir.1987). *Humana*, 881 F.2d at 252–53. Based on *Clougherty*, the *Humana* court reasoned that it must look only to the effect of a claim on the insured's assets to determine whether that party shifted its risks. *Id.* at 252. The court reasoned that this approach, unlike the economic family argument, was consistent with the Supreme Court's holding in *Moline Properties v. Commissioner*, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943), that a court must not disregard the separate legal status of various companies where the companies have a valid business purpose and are not sham corporations.

In finding that the subsidiaries shifted the risks of loss to the captive, the court noted, "There is simply no direct connection in this case between a loss sustained by the [captive] insurance company and the affiliates of Humana. . . ." *Humana*, 881 F.2d at 252. The court also concluded that a court should not look to the parent to determine whether a subsidiary shifted its risk of loss, since to do so treats the parent and its subsidiaries as one "economic unit" in contravention of *Moline Properties*. *Id.* at 256.

Although the court's test for risk shifting focused on the insured's balance sheet, the court explicitly noted that the Humana captive met Colorado's statutory minimum requirements for an insurance company and was recognized as a valid insurance company following an audit and certification by the state. *Id.* at 253. In finding that the captive was "devoid of sham," the court further pointed out that the captive "was fully capitalized and no agreement ever existed under which the subsidiaries or Humana Inc. would contribute additional capital to [the captive]." *Id.* Further, Humana and its subsidiaries "never contributed additional amounts to [the captive] nor took any steps to insure [the captive's] performance." *Id.* The court then distinguished the cases relied upon by the Commissioner as involving undercapitalized captives which often had indemnification agreements running from the parent to the captive. In a footnote accompanying this portion of the text, the court stated:

> The *Carnation* case involved an undercapitalized foreign captive, with a capitalization agreement running to the captive from the parent. *Stearns–Roger*, although involving an adequately capitalized domestic captive, involved an indemnification agreement

---

1. The Internal Revenue Service first articulated its "economic family" theory in Revenue Ruling 77–316, 1977–2 C.B. 53. The Service ruled that insurance arrangements between related corporations are not true insurance but "self-insurance." This conclusion was based on the premise that the corporations participating in the captive insurance arrangement "though separate entities, represent one *economic family* with the result that those who bear the ultimate economic burden of corporate loss are the same persons who suffer the loss." *Id.* (emphasis added) Basically, the "economic family" approach mandates that all transactions among members of a corporate group must be disregarded.

running from the parent to the captive. A third case, *Beech Aircraft Corp. v. U.S.,* 797 F.2d 920 (10th Cir.1986), mentioned as support for the majority position, also involved an undercapitalized captive. *These weaknesses alone provided a sufficient basis from which to find no risk shifting and to decide the cases in favor of the Commissioner.* The *Humana* case contained no such indemnification agreement and Health Care Indemnity [the captive] was adequately capitalized. *Humana,* 881 F.2d at 254 n. 2. (emphasis added)

### B.

On appeal the parties urge different interpretations of this court's holding in *Humana.*

The Commissioner argues that she does not rely on the economic family concept. Rather, she contends, there are critical differences between *Humana* and the present case that require the present case to be analyzed in light of these differences. When this analysis is undertaken, the Commissioner asserts, it is clear that the present case involves a scheme that contains the same "weaknesses" referred to in *Humana*'s footnote 2, weaknesses that "alone provide [ ] sufficient basis from which to find no risk shifting."

Malone & Hyde replies that footnote 2 referred only to the premium Humana paid for its own coverage and did not relate to the court's determination of the brother-sister issue. Malone & Hyde asserts that *"Humana* requires that one look solely to the insured's assets and consider the effect on those assets of a claim filed with an insurance company subsidiary." (Brief at 10) Consequently, Malone & Hyde contends that the letters of credit and hold harmless agreements in this case are "irrelevant" for the purpose of applying this court's balance sheet test adopted in *Humana.* Malone & Hyde argues that because the risk of loss was shifted away from the subsidiaries' assets, the premiums paid by those subsidiaries constitute valid insurance payments, deductible as business expenses on the consolidated tax returns. Malone & Hyde also dismisses the Commissioner's argument as premised on the discredited economic family argument, which is untenable under the *Moline Properties* doctrine.

### V.

### A.

This court clearly applied the *Le Gierse* analysis in *Humana.* But it did so only after finding that Humana's use of a Colorado captive insurance company was not a sham and that it served a legitimate business purpose.

We believe the tax court put the cart before the horse in this case. It should have determined first whether Malone & Hyde created Eastland for a legitimate business purpose or whether the captive was in fact a sham corporation. A taxpayer is "free to arrange his financial affairs to minimize his tax liability." *Estate of Stranahan v. C.I.R.,* 472 F.2d 867, 869 (6th Cir.1973). Thus, "the presence of tax avoidance motives will not nullify an otherwise bona fide transaction." *Id.* However, the establishment of a tax deduction is not, in and of itself, an "otherwise bona fide transaction" if the deduction is accomplished through the use of an undercapitalized foreign insurance captive that is propped-up by guarantees of the parent corporation. The captive in such a case is essentially a sham corporation, and the payments to such a captive that are designated as insurance premiums do not constitute bona fide business expenses, entitling the taxpayer to a deduction under § 162(a).

In contrast to the situation in *Humana,* Malone & Hyde had no problems obtaining insurance from an unrelated insurance carrier. Humana, a hospital chain with enormous risk exposure, found itself without coverage when its insurance was cancelled. It faced an obvious dilemma and acted in a legitimate manner in seeking to find an answer. Malone & Hyde was not responding to any such crisis when it created Eastland. Rather, it departed drastically from the norm, and without any legitimate reason, devised the circuitous scheme for realizing tax deductions heretofore described.

In addition, Humana created HCI as a fully capitalized insurer under Colorado law, subject to regulatory control of that state's insurance commission. In contrast, Eastland undertook to reinsure the first $150,000 of each claim against Malone & Hyde, while operating on the extremely thin minimum capitalization required by Bermuda law. The record does not indicate that Bermuda exercised oversight similar to that which Colorado exercised over Humana's captive insurer. At the time, Malone & Hyde had more than 6,000 employees eligible for workers' compensation, about 1,800 vehicles including heavy-duty over-the-road trucks, and a plethora of buildings and other physical facilities.

Given the apparent inability of Eastland to pay a significant volume of claims, it was perfectly reasonable for Northwestern to demand protection from Malone & Hyde if it was to be the primary insurer, though retaining only a small part of the total premiums. This brings us to the third important factual distinction between *Humana* and the present case—the hold harmless agreements Malone & Hyde furnished Northwestern on two occasions. Under these documents, Malone & Hyde agreed that in the event Eastland defaulted on its obligations as reinsurer of Northwestern, Malone & Hyde: (1) would not pursue against Northwestern any claim arising out of the policies; and (2) would hold Northwestern harmless and defend Northwestern against any claims or judgments under the policies from any third party. (JA at 88–89, 212, 214)

### B.

Two of the three differences discussed above reveal that Malone & Hyde's scheme contains the very "weaknesses" the *Humana* court referred to as "alone provid[ing] a sufficient basis from which to find no risk shifting" in footnote 2. On the other hand, Humana's scheme involved none of these "weaknesses." *Humana*, 881 F.2d at 254 n. 2. The presence of these "weaknesses" in this case indicates that the captive insurance scheme established by Malone & Hyde was not an "otherwise bona fide transaction," but a sham.

Interestingly, none of the three cases mentioned in the footnote concerned both undercapitalized captive insurers and guarantees running from the insured to the primary insurer. Yet, the *Humana* court found the presence of either one of the "weaknesses" sufficient to support a judgment for the Commissioner in the cited cases.

*Carnation v. Commissioner*, the first case cited in the footnote, involved a wholly-owned insurance subsidiary organized under Bermuda law with $120,000 of paid-in capital. As in the present case, an unrelated commercial insurer issued a policy to Carnation Corp., and the wholly-owned foreign subsidiary of Carnation agreed simultaneously to reinsure 90% of the primary insurer's liability under Carnation's policy. In return, the unrelated insurer ceded to the Carnation subsidiary 90% of the premium it received from Carnation. There was no letter of credit or other guarantee, but Carnation agreed to capitalize the Bermuda subsidiary up to $3 million on its own election or upon request of the insurance subsidiary. *Carnation*, 640 F.2d at 1012. In upholding the Commissioner's deficiency determination, the *Carnation* court held that the key to the decision was that the outside insurer would not have entered into the agreement, considering the subsidiary's undercapitalization, without the undertaking by Carnation to increase that capitalization by a factor of 25. The agreements were interdependent, and it was necessary to consider them together. *Id.* at 1013.

*Stearns–Roger*, the second case cited in the footnote, involved an adequately capitalized subsidiary incorporated under the same Colorado statute used by Humana. Nevertheless, the parent company agreed to indemnify its subsidiary against claims up to $3 million. Responding to the taxpayer's argument that the Commissioner and the court were applying the economic reality test, the court stated:

> The result we here reach is not inconsistent with the fact that the parent and the subsidiary are separate corporate entities. *Moline Properties v. Commissioner*, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943). The separation is not ignored in-

stead the focus must be on the nature and consequences of the payments by the parent and the Supreme Court's requirement that there must be a shift of risk to have insurance. There is no question that the parent paid the subsidiary, but the consequence of the payments sought to be deducted nevertheless still left the parent with its losses. The parent did not for its money receive "insurance." Many intercorporate transfers of funds are recognized, but in the circumstances before us nothing was received by the parent company in return. No insurance resulted.

*Stearns-Roger,* 774 F.2d at 416.

The facts in *Beech Aircraft,* the third case cited in footnote 2, presented yet another variation. Based on all the facts, the *Beech Aircraft* court agreed with the Commissioner and the tax court—there was no risk shifting because, in the end, the parent company stood to be required to pay claims. The court stated it did not overlook the separate corporate existence of the insurance subsidiary in violation of *Moline. Beech Aircraft,* 797 F.2d at 923.

*Gulf Oil Corp. v. Commissioner,* 914 F.2d 396 (3d Cir.1990), was decided after this court decided *Humana.* We have no doubt, however, that *Gulf Oil* would have been included in footnote 2 if it had been decided before *Humana.* The facts in *Gulf Oil* are strikingly similar to those in the present case. A parent with extensive exposure formed a Bermuda subsidiary with $120,000 capitalization. Gulf and its affiliates purchased a wide range of insurance from commercial carriers who reinsured their risks with Gulf's foreign insurance subsidiary and ceded portions of the premiums to the subsidiary. *Id.* at 410. Gulf executed agreements with the unrelated carriers guaranteeing indemnification to those carriers in the event of default by the captive insurer. *Id.*

In disallowing deductions for the premiums, the court of appeals in *Gulf Oil* recognized and distinguished *Humana.* The court also stated that it was following the reasoning of *Clougherty Packing Co. v. Commissioner,* 811 F.2d 1297 (9th Cir.1987), relied upon and adopted by this court in *Humana.* The *Clougherty* court stated, "Where separate agreements are interdependent, they must be considered together so that their overall economic effect can be assessed." *Clougherty,* 811 F.2d at 1301. The *Clougherty* court dismissed the argument that it was relying on the economic family concept in considering the "overall effect" of the interdependent agreements. *Id.* at 1305.

## VI.

If Humana's scheme had involved a thinly-capitalized captive foreign insurance company that ended up with a large portion of the premiums paid to a commercial insurance company as primary insurer, and had included a hold harmless agreement from Humana indemnifying the unrelated insurer against all liability, we believe the result in *Humana* would have been different. This court accepted the bona fides of the transaction in *Humana* and recognized the premiums paid to the captive insurance company as deductible business expenses since Humana established the captive to address a legitimate business concern (the loss of insurance coverage), and the captive was not a sham corporation; the captive in *Humana* was fully capitalized, domestically incorporated, and established without guarantees from the parent or other related corporations. Because Humana acted in a straightforward manner, without any evidence of an intent to create an unwarranted tax deduction based on payments that largely ended up in its subsidiary's coffers, this court accepted the bona fides of the transaction before examining the brother-sister issue.

We disagree with Malone & Hyde's contention that footnote 2 in *Humana* refers only to the question of whether Humana's premium payments for its own coverage, as opposed to the coverage extended its subsidiaries, involved risk shifting. Footnote 2 clearly applies to the fundamental and decisive question of whether there was risk shifting from any insured—parent or subsidiary—to the captive insurer. When the entire scheme involves either undercapitalization or indemnification of the primary insurer by the taxpayer claiming the deduction, or both, these facts alone disqualify the premium payments from being treated as ordinary

and necessary business expenses to the extent such payments are ceded by the primary insurer to the captive insurance subsidiary.

It is true that Eastland operated as an insurance company. As the tax court found, it "established reserve accounts, paid claimed losses only after the validity of those claims had been established, and was profitable." (JA at 111) For purposes of determining the correct tax treatment of premiums paid to Eastland by Malone & Hyde, however, we cannot be blind to the realities of the case. The "interdependent" separate agreements, when considered together, *Clougherty*, 811 F.2d at 1301, indicate an arrangement under which there was no risk shifting. Under the hold harmless agreement, the ultimate risk for workers' compensation, auto liability, and general liability remained with Malone & Hyde. This being so, the transactions did not result in Malone & Hyde or the subsidiaries receiving "insurance" from Eastland within the meaning of that term under the Internal Revenue Code.

The judgment of the tax court is **REVERSED** and the case is **REMANDED** for re-entry of the original judgment for the Commissioner pursuant to the tax court's first opinion.