Lauber, J., dissenting: These cases, like Humana Inc. & Subs. v. Commissioner, 88 T.C. 197 (1987), aff’d in part, rev’d in part and remanded, 881 F.2d 247 (6th Cir. 1989), involve what I will refqr to as a “classic” captive insurance company. In these cases, as in Humana, the captive has no outside owners and insures no outside risks. Rather, it is wholly owned by the parent of the affiliated group and it “insures” risks only of the parent and the operating subsidiaries, which stand in a brother-sister relationship to it. In Humana we held that purported “insurance” premiums paid to a captive by other members of its affiliated group— whether by the parent or by the sister corporations — were not deductible for Federal income tax purposes. An essential requirement of “insurance” is the shifting of risk from insured to insurer. Helvering v. Le Gierse, 312 U.S. 531, 539 (1941). We held in Humana that “there was not the necessary shifting of risk” from the operating subsidiaries to the captive, and hence that none of the purported “premiums” constituted amounts paid for “insurance.” 88 T.C. at 214. The Court of Appeals for the Sixth Circuit affirmed as to amounts paid to the captive by the parent, but reversed as to amounts paid to the captive by the sister corporations. 881 F.2d at 257. The opinion of the Court (majority) adopts the reasoning and result of the Sixth Circuit, overrules Humana in part, and holds that amounts charged to the captive’s sister corporations constitute deductible “insurance premiums.” I dissent both from the majority’s decision to overrule Humana and from its holding that amounts charged to the sister corporations constituted payments for “insurance” under the totality of the facts and circumstances. I. Background The captive insurance issue has a rich history to which the majority refers only episodically. It has been clear from the outset of our tax law that taxpayers (other than insurance companies) cannot deduct contributions to an insurance reserve. Steere Tank Lines, Inc. v. United States, 577 F.2d 279, 280 (5th Cir. 1978); Spring Canyon Coal Co. v. Commissioner, 43 F.2d 78, 80 (10th Cir. 1930). Thus, if a unitary operating company maintains a reserve for self-insurance, amounts it places in that reserve are not deductible as “insurance premiums.” One strategy by which taxpayers sought to avoid this non-deductibility rule was to place their self-insurance reserve into a captive insurance company. In cases involving “classic” captives — i.e., captives that have no outside owners and insure no outside risks — the courts have uniformly held that this strategy does not work. Employing various legal theories, every court to consider the question has held that amounts paid by a parent to a classic captive do not constitute “insurance premiums.”[1] Insurance and tax advisers soon devised an alternative strategy for avoiding the bar against deduction of contributions to a self-insurance reserve — namely, adoption of or conversion to a holding company structure. In essence, an operating company would drop its self-insurance reserve into a captive; drop its operations into one or more operating subsidiaries; and have the purported “premiums” paid to the captive by the sister companies instead of by the parent. In Humana, we held that this strategy did not work either, reasoning that “we would exalt form over substance and permit a taxpayer to circumvent our holdings [involving parent-captive payments] by simple corporate structural changes.” 88 T.C. at 213. In effect, we concluded in Humana that conversion to a holding-company structure — without more — should not enable a taxpayer to accomplish indirectly what it cannot accomplish directly, achieving a radically different and more beneficial tax result when there has been absolutely no change in the underlying economic reality. While the Commissioner had success litigating the parent-captive pattern, he had surprisingly poor luck litigating the brother-sister scenario. The Tenth Circuit, like our Court, agreed that brother-sister payments to a classic captive are not deductible as “insurance premiums.”[2] By contrast, the Sixth Circuit in Humana reversed our holding to this effect. And after some initial ambivalence, the Court of Federal Claims appears to have concluded that brother-sister “premium” payments are deductible.[3] The Commissioner had even less success persuading courts to adopt the “single economic family” theory enunciated in Rev. Rul. 77-316, 1977-2 C.B. 53, upon which his litigating position was initially based. That theory was approved by the Tenth Circuit[4] and found some favor in the Ninth Circuit.[5] But it was rejected by our Court[6] as well as by the Sixth and Federal Circuits.[7] Assessing this track record, the Commissioner made a strategic retreat. In 2001 the IRS announced that it “will no longer invoke the economic family theory with respect to captive insurance transactions.” Rev. Rui. 2001-31, 2001-1 C.B. 1348, 1348. In 2002 the IRS likewise abandoned its position that there is a per se rule against the deductibility of brother-sister “premiums,” concluding that the characterization of such payments as “insurance premiums” should be governed, not by a per se rule, but by the facts and circumstances of the particular case. Rev. Rul. 2002-90, 2002-2 C.B. 985; accord Rev. Rul. 2001-31, 2001-1 C.B. at 1348 (“The Service may * * * continue to challenge certain captive insurance transactions based on the facts and circumstances of each case.”). II. Overruling Humana We decided Humana against a legal backdrop very different from that which we confront today. The Commissioner in Humana urged a per se rule, predicated on his “single economic family” theory, against the deductibility of brother-sister “insurance premiums.” The Commissioner has long since abandoned both that per se rule and the theory on which it was based. Given this change in the legal environment, I see no need for the Court to reconsider Humana, which in a practical sense may be water under the bridge. Respondent’s position in the instant cases is consistent with the ruling position the IRS has maintained for the past 12 years — namely, that characterization of intragroup payments as “insurance premiums” should be determined on the basis of the facts and circumstances of the particular case. See Rev. Rul. 2001—31, 2001-1 C.B. at 1348. The majority adopts this approach as the framework for its legal analysis. See op. Ct. pp. 13-14 (“We consider all of the facts and circumstances to determine whether an arrangement qualifies as insurance.”). The Court need not overrule Humana to decide (erroneously in my view) that respondent should lose under the facts-and-circumstances approach that respondent is now advancing. In Humana, “we emphasize[d] that our holding * * * [was] based upon the factual pattern presented in * * * [that] case,” noting that in other cases “factual patterns may differ.” 88 T.C. at 208. That being so, the Court today could rule for petitioners on the basis of what the majority believes to be the controlling “facts and circumstances,” distinguishing Humana rather than overruling it. Principles of judicial restraint counsel that courts should decide cases on the narrowest possible ground. III. The “Facts and Circumstances” Approach Although I do not believe it necessary or proper to overrule Humana, the continuing vitality of that precedent does not control the outcome. These cases can and should be decided in respondent’s favor under the “facts and circumstances” approach that he is currently advancing. In Rev. Rul. 2002-90, 2002-2 C.B. at 985, the IRS concluded that brother-sister payments were correctly characterized as “insurance premiums” where the assumed facts included the following (P = parent and S = captive): P provides S adequate capital * * *. S charges the 12 [operating] subsidiaries arms-length premiums, which are established according to customary industry rating formulas. * * * There are no parental (or other related party) guarantees of any kind made in favor of S. * * * In all respects, the parties conduct themselves in a manner consistent with the standards applicable to an insurance arrangement between unrelated parties. The facts of the instant cases, concerning both “risk shifting” and conformity to arm’s-length insurance standards, differ substantially from the facts assumed in Rev. Rul. 2002-90, supra. The instant facts also differ substantially from the facts determined in judicial precedents that have characterized intragroup payments as “insurance premiums.” Whether the facts and circumstances, evaluated in the aggregate, give rise to “insurance” presents a question of proper characterization. It is thus a mixed question of fact and law. The majority makes certain findings of basic fact, which I accept for purposes of this dissenting opinion. In many instances, however, the majority makes no findings of basic fact to support its conclusory findings of ultimate fact. In other instances, the majority does not mention facts that tend to undermine its ultimate conclusions. In my view, the undisputed facts of the entire record warrant the opposite conclusion from that reached by the majority and justify a ruling that the Rent-A-Center arrangements do not constitute “insurance” for Federal income tax purposes. A. Risk Shifting 1. Parental Guaranty Rent-A-Center, the parent, issued two types of guaranties to Legacy, its captive. First, it guaranteed the multi-million-dollar “deferred tax asset” (DTA) on Legacy’s balance sheet, which arose from timing differences between the captive’s fiscal year and the parent’s calendar year. Normally, a DTA cannot be counted as an “asset” for purposes of the (rather modest) minimum solvency requirements of Bermuda insurance law. The parent’s guaranty was essential in order for Legacy to secure an exception from this rule. Second, the parent subsequently issued an all-purpose guaranty by which it agreed to hold Legacy harmless for its liabilities under the Bermuda Insurance Act up to $25 million. These liabilities necessarily included Legacy’s liabilities to pay loss claims of its sister corporations. This all-purpose $25 million guaranty was eliminated at yearend 2006, but it was in existence for the first three tax years at issue. When approving the brother-sister premiums in Rev. Rul. 2002-90, 2002-2 C.B. at 985, the IRS explicitly excluded from the hypothesized facts the existence of any parental or related-party guaranty executed in favor of the captive. Numerous courts have likewise ruled that the existence of a parental guaranty, indemnification agreement, or similar instrument may negate the existence of “insurance” purportedly supplied by a captive. See, e.g., Malone & Hyde, Inc. v. Commissioner, 62 F.3d 835, 842-843 (6th Cir. 1995) (finding no “insurance” where parent guaranteed captive’s liabilities), rev’g T.C. Memo. 1993-585; Humana, 881 F.2d at 254 n.2 (presence of parental indemnification or recapitalization agreement may provide a sufficient basis on which to find no “risk shifting”); Carnation Co. v. Commissioner, 71 T.C. 400, 402, 409 (1978) (finding no “insurance” where parent agreed to supply captive with additional capital), aff’d, 640 F.2d 1010 (9th Cir. 1981); Kidde Indus., Inc. v. United States, 40 Fed. Cl. 42, 50 (1997) (finding no “insurance” where parent issued indemnification letter). By guaranteeing Legacy’s liabilities, Rent-A-Center agreed to step into Legacy’s shoes to pay its affiliates’ loss claims. In effect, the parent thus became an “insurer” of its subsidiaries’ risks. The majority cites no authority, and I know of none, for the proposition that a holding company can “insure” the risks of its wholly owned subsidiaries. The presence of this parental guaranty argues strongly against the existence of “risk shifting” here. The majority asserts that Rent-A-Center’s parental guaranty “did not vitiate risk shifting” and offers three rationales for this conclusion. See op. Ct. pp. 22-24. None of these rationales is convincing. The majority notes that the parent “did not pay any money pursuant to the parental guaranty” and suggests that the guaranty was really designed only to make sure that Legacy’s DTAs were counted in calculating its Bermuda minimum solvency margin. See id. p. 23. The fact that the parent was never required to pay on the guaranty is irrelevant; it is the existence of a parental guaranty that matters in determining whether a captive is truly providing “insurance.” And whatever may have prompted the issuance of the guaranty, the fact is that it literally covers all of Legacy’s liabilities up to $25 million. The DTAs never got above $9 million during 2003-06. See id. p. 10. Legacy’s “liabilities” obviously included Legacy’s liability to pay the insurance claims of its sister companies. The majority contends that the judicial precedents cited above “are distinguishable” because the guaranty issued by Rent-A-Center “did not shift the ultimate risk of loss; did not involve an undercapitalized captive; and was not issued to, or requested by, an unrelated insurer.” See id. p. 23. The majority’s first asserted distinction begs the question because it assumes that risk has been shifted to Legacy, which is the proposition that must be proved. The majority’s second asserted distinction is a play on words. While Legacy for most of the period at issue was not “undercapitalized” from the standpoint of Bermuda’s (modest) minimum solvency rules, it was very poorly capitalized in comparison with real insurance companies. See infra pp. 41-43. Moreover, the Court of Appeals for the Sixth Circuit in Humana indicated that a parental guaranty alone, without regard to the captive’s capitalization, can “provideD a sufficient basis from which to find no risk shifting.” 881 F.2d at 245 n.2. The majority’s third asserted distinction is a distinction without a difference. While Rent-A-Center’s guaranty was not requested by “an unrelated insurer,” it was demanded by Legacy’s nominal insurance regulator as a condition of meeting Bermuda’s minimum solvency requirements. As the “most importante ]” ground for deeming the guaranty irrelevant, the majority asserts that the parental guaranty “did not affect the balance sheets or net worth of the subsidiaries insured by Legacy.” See op. Ct. p. 22. The majority here reprises its argument that the “net worth and balance sheet analysis” must be conducted at the level of the operating subsidiaries. See id. pp. 15-16, 21. Whatever the merit of that argument generally, as applied to the guaranty it clearly proves too much. A parental guaranty of a captive’s liabilities will never affect the balance sheet or net worth of the sister company that is allegedly “insured.” But the Sixth Circuit, the Federal Circuit, and this Court have all held that the existence of a parental guaranty may negate the existence of “insurance” within an affiliated group. 2. Inadequate Capitalization When blessing the brother-sister premium payments in Rev. Rui. 2002-90, supra, the Commissioner hypothesized that the parent had supplied the captive with “adequate capital.” Numerous judicial opinions have likewise held that risk cannot be “shifted” to a captive unless the captive is sufficiently capitalized to absorb the risk. See, e.g., Beech Aircraft, 797 F.2d at 922 n.1 (no “insurance” where captive was undercapitalized); Carnation Co., 71 T.C. at 409 (same). The majority bases its conclusion that Legacy was “adequately capitalized” on the fact that Legacy “met Bermuda’s minimum statutory requirements” once the parental guaranty of the DTA is counted. See op. Ct. p. 13. The fact that a captive meets the minimum capital requirements of an offshore financial center is not dispositive as to whether the arrangements constitute “insprance” for Federal income tax purposes. Indeed, the Sixth Circuit in Malone & Hyde held that intragroup payments were not “insurance premiums” even though the captive met “the extremely thin minimum capitalization required by Bermuda law.” 62 F.3d at 841. In fact, Legacy’s capital structure was extremely questionable during 2003-06. The only way that Legacy was able to meet Bermuda’s extremely thin minimum capitalization requirement was by counting as general business assets its DTAs, and those DTAs could be counted only after Rent-A-Center issued its parental guaranty. The DTAs were essentially a bookkeeping entry. Without treating that bookkeeping entry as an “asset,” Legacy would have been under-capitalized even by Bermuda’s lax standards. The extent of Legacy’s undercapitalization is evidenced by its premium-to-surplus ratio, which was wildly out of line with the ratios of real insurance companies. The premium-to-surplus ratio provides a good benchmark of an insurer’s ability to absorb risk by drawing on its surplus to pay incurred losses. In this ratio, “premiums written” serves as a proxy for the losses to which the insurer is exposed. Expert testimony in these cases indicated that U.S. property/casualty insurance companies, on average, have something like a 1:1 premium-to-surplus ratio. In other words, their surplus roughly equals the annual premiums for policies they write. By contrast, Legacy’s premium-to-surplus ratio — ignoring the parental guaranty of its DTA — was 48:1 in 2003, 19:1 in 2004, 11:1 in 2005, and in excess of 5:1 in 2006 and 2007. In other words, Legacy’s surplus covered only 2% of premiums for policies written in 2003 and only 5% of premiums for policies written in 2004, whereas commercial insurance companies have surplus coverage in the range of 100%. Even if we allow the parental guaranty to count toward Legacy’s surplus, its premium-to-surplus ratio was never better than 5:1. Legacy’s assets were undiversified and modest. It had a money market fund into which it placed the supposed “premiums” received from its parent. This fund was in no sense “surplus”; it was a mere holding tank for cash used to pay “claims.” Apart from this money market fund, Legacy appears to have had no assets during the tax years at issue except the following: (a) the guaranties issued by its parent; (b) the DTA reflected on its balance sheet; and (c) Rent-A-Center treasury stock that Legacy purchased from its parent. For Federal tax purposes, the parental guaranties cannot count as “assets” in determining whether Legacy was adequately capitalized. They point in the precisely opposite direction. The DTA and treasury stock have in common several features that make them poor forms of insurance capital. First, neither yields income. The DTA was an accounting entry that by definition cannot yield income, and the Rent-A-Center treasury stock paid no dividends. No true insurance company would invest 100% of its “reserves” in non-income-producing assets. With no potential to earn income, the “reserves” could not grow to afford a cushion against risk. Moreover, neither the DTA nor the treasury stock was readily convertible into cash. The DTA had no cash value. The treasury stock by its terms could not be sold or alienated, although the parent agreed to buy it back at its issue price. In effect, Legacy relied on the availability of cash from its parent, via repurchase of treasury shares, to pay claims in the event of voluminous losses.[8] Finally, Legacy’s assets were, to a large degree, negatively correlated with its insurance risks. During 2004-06, Legacy purchased $108 million of Rent-A-Center treasury stock, while “insuring” solely Rent-A-Center risks. Thus, if outsized losses occurred, those losses would simultaneously increase Legacy’s liabilities and reduce the value of the Rent-A-Center stock that was Legacy’s principal asset. No true insurance company invests its reserves in assets that are both undiversified and negatively correlated to the risks that it is insuring. In sum, when one combines the existence of the parental guaranty, Legacy’s extremely weak premium-to-surplus ratio, the speculative nature and poor quality of the assets in Legacy’s “insurance reserves,” and the fact that Legacy without the parental guaranty would not even have met “the extremely thin minimum capitalization required by Bermuda law,” Malone & Hyde, 62 F.3d at 841, the absence of “risk shifting” seems clear. Under the totality of the facts and circumstances, I conclude that there has been no transfer of risk to the captive and hence that the Rent-A-Center arrangements do not constitute “insurance” for Federal income tax purposes. B. Conformity to Insurance Industry Standards When blessing the brother-sister premiums in Rev. Rul. 2002-90, supra, the IRS hypothesized that “the parties [had] conducted] themselves in a manner consistent with the standards applicable to an insurance arrangement between unrelated parties.” Our Court has similarly ruled that transactions in a captive-insurance context must comport with “commonly accepted notions of insurance.” Harper Grp. v. Commissioner, 96 T.C. 45, 58 (1991), aff’d, 979 F.2d 1341 (9th Cir. 1992). Because risk shifting is essential to “insurance,” Helvering v. Le Gierse, 312 U.S. at 539, the absence of risk shifting alone would dictate that the Rent-A-Center payments are not deductible as “insurance premiums.” However, there are a number of respects in which Rent-A-Center, its captive, and the allegedly “insured” subsidiaries did not conduct themselves in a manner consistent with accepted insurance industry norms. These facts provide additional support for concluding that these arrangements did not constitute “insurance.” Several facts discussed above in connection with “risk shifting” show that the Rent-A-Center arrangements do not comport with normal insurance industry practice. These include the facts that Legacy was poorly capitalized; that its premium-to-surplus ratio was way out of line with the ratios of true insurance companies; and that is “reserves” consisted of assets that were non-income-producing, illiquid, undiversified, and negatively correlated to the risks it was supposedly “insuring.” No true insurance company would act this way. It appears that Legacy had no actual employees during the tax years at issue. It had no outside directors, and it had no officers apart from people who were also officers of Rent-A-Center, its parent. Legacy’s “operations” appear to have been conducted by David Glasgow, an employee of Rent-A-Center, its parent. “Premium payments” and “loss reimbursements” were effected through bookkeeping entries made by accountants at Rent-A-Center’s corporate headquarters. Legacy was in practical effect an incorporated pocketbook that served as a repository for what had been, until 2003, Rent-A-Center’s self-insurance reserve. Legacy issued its first two “insurance policies” before receiving a certificate of registration from Bermuda insurance authorities. According to those authorities, Legacy was therefore in violation of Bermuda law and “engaged in the insurance business without a license.” (Bermuda evidently agreed to let petitioners fix this problem retroactively.) For the first three months of its existence, Legacy was in violation of Bermuda’s minimum capital rules because the DTA was not cognizable in determining capital adequacy. Only upon the issuance of the parental guaranty in March 2003, and the acceptance of this guaranty by Bermuda authorities, was Legacy able to pass Bermuda’s capital adequacy test. There was no actuarial determination of the premium payable to Legacy by each operating subsidiary based on the specific subsidiary’s risk profile. Rather, an outside insurance adviser estimated the future loss exposure of the affiliated group, and Rent-A-Center, the parent, determined an aggregate “premium” using that estimate. The parent paid this “premium” annually to Legacy. The parent’s accounting department subsequently charged portions of this “premium” to each subsidiary, in the same manner as self-insurance costs had been charged to those subsidiaries before Legacy was created. In other words, in contrast to the facts assumed in Rev. Rul. 2002-90, supra, there was in these cases no determination of “arms-length premiums * * * established according to customary industry rating formulas.” To the contrary, the entire arrangement was orchestrated exactly as it had been orchestrated before 2003, when the Rent-A-Center group maintained a self-insurance reserve for the tranche of risks purportedly “insured” by Legacy. From Legacy’s inception in December 2002 through May 2004, Legacy did not actually pay “loss claims” submitted by the supposed “insureds.” Rather, the parent’s accounting department netted “loss reimbursements” due to the subsidiaries from Legacy against “premium payments” due to Legacy from the parent. Beginning in July 2004, the parent withdrew a fixed, preset amount of cash via weekly bank wire from Legacy’s money market account. These weekly withdrawals depleted Legacy’s money market account to near zero just before the next annual “premium” was due. This modus operandi shows that Rent-A-Center regarded Legacy not as an insurer operating at arm’s length but as a bank account into which it made deposits and from which it made withdrawals. These facts, considered in their totality, lead me to disagree with the majority’s conclusory assertions that “Legacy entered into bona fide arm’s length contracts with * * * [Rent-A-Center]”; that Legacy “charged actuarially determined premiums”; that Legacy “paid claims from its separately maintained account”; and that Legacy “was adequately capitalized.” See op. Ct. p. 13. In my view, the totality of the facts and circumstances could warrant the conclusion that Legacy was a sham. At the very least, the totality of the facts and circumstances makes clear that the arrangements here did not comport with “commonly accepted notions of insurance,” Harper Grp., 96 T.C. at 58, and that the Rent-A-Center group of companies did not “conduct themselves in a manner consistent with the standards applicable to an insurance arrangement between unrelated parties,” Rev. Rul. 2002-90, 2001-2 C.B. at 985. The departures from accepted insurance industry practice, combined with the absence of risk shifting to the captive from the alleged “insureds,” confirms that these arrangements did not constitute “insurance” for Federal income tax purposes. Colvin, Gale, Kroupa, and Morrison, JJ., agree with this dissent. See Beech Aircraft Corp. v. United States, 797 F.2d 920 (10th Cir. 1986); Stearns-Roger Corp. v. United States, 774 F.2d 414, 415-416 (10th Cir. 1985); Humana Inc. & Subs. v. Commissioner, 88 T.C. 197, 207 (1987), aff’d in part, rev’d in part and remanded, 881 F.2d 247 (6th Cir. 1989); Clougherty Packing Co. v. Commissioner, 84 T.C. 948 (1985), aff’d, 811 F.2d 1297, 1307 (9th Cir. 1987); Carnation Co. v. Commissioner, 71 T.C. 400 (1978), aff’d, 640 F.2d 1010, 1013 (9th Cir. 1981). On the other hand, the courts have held that parent-captive payments may constitute “insurance premiums” where the captive has a sufficient percentage of outside owners or insures a sufficient percentage of outside risks. See, e.g., Sears, Roebuck & Co. v. Commissioner, 96 T.C. 61 (1991) (approximately 99.75% of insured risks were outside risks), supplemented by 96 T.C. 671 (1991), aff’d in part and rev’d in part, 972 F.2d 858 (7th Cir. 1992); Harper Grp. v. Commissioner, 96 T.C. 45 (1991) (approximately 30% of insured risks were outside risks), aff’d, 979 F.2d 1341 (9th Cir. 1992); AMERCO v. Commissioner, 96 T.C. 18 (1991) (between 52% and 74% of insured risks were outside risks), aff’d, 979 F.2d 162 (9th Cir. 1992). See Beech Aircraft Corp., 797 F.2d at 922; Stearns-Roger Corp., 774 F.2d at 415-416. Compare Mobil Oil Corp. v. United States, 8 Cl. Ct. 555, 566 (1985) (“[B]y deducting the premiums on its tax returns, * * * [the affiliated group] achieved indirectly that which it could not do directly. It is well settled that tax consequences must turn upon the economic substance of a transaction^]”), with Kidde Indus., Inc. v. United States, 40 Fed. Cl. 42 (1997) (brother-sister payments deductible for years for which parent did not provide indemnity agreement). See generally Ocean Drilling & Exploration Co. v. United States, 988 F.2d 1135, 1153 (Fed. Cir. 1993) (brother-sister payments deductible where captive insured significant outside risks). See Beech Aircraft Corp., 797 F.2d 920; Stearns-Roger Corp., 774 F.2d at 415-416. See generally Humana, 881 F.2d at 251 (“Stearns-Roger, Mobil Oil, and Beech Aircraft * * * each explicitly or implicitly adopted the economic family concept.”). See Clougherty Packing, 811 F.2d at 1304 (“[W]e seriously doubt that the use of an economic family concept in defining insurance runs afoul of the Supreme Court’s holding in Moline Properties.”); id. at 1305 (finding “considerable merit in the Commissioner’s [economic family] argument” but finding it unnecessary to rely on that theory); Carnation Co., 640 F.2d at 1013. See Humana, 88 T.C. at 214 (rejecting the Commissioner’s “economic family” concept); Clougherty Packing, 84 T.C. at 956 (same); Carnation Co., 71 T.C. at 413 (same). See Malone & Hyde, Inc. v. Commissioner, 62 F.3d 835 (6th Cir. 1995) (rejecting “economic family” theory but ruling against deductibility of payments to captive based on facts and circumstances), rev’g T.C. Memo. 1993-585; Ocean Drilling & Exploration Co., 988 F.2d at 1150-1151; Humana, 881 F.2d at 251. Because Legacy “insured” losses only below a defined threshold, there was a cap on the size of any individual loss that it might have to pay. See op. Ct. p. 5. However, the number of individual loss events within that tranche could exceed expectations.