T.C. Memo. 2019-34

UNITED STATES TAX COURT

SYZYGY INSURANCE CO., INC., ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 2140-15, 2141-15,          Filed April 10, 2019.
       2142-15, 2143-15,
       2182-15.

LeRoy L. Metz II, Brian T. Must, and Joshua D. Baker, for petitioners.

John P. Healy, Dawn L. Danley-Nichols, Robin Lynne Herrell, Daniel M. Trevino, and James D. Hill, for respondent.

---

[1]Cases of the following petitioners are consolidated herewith: John W. Jacob and Melinda L. Jacob, docket No. 2141-15; Michael VanLenten and Elizabeth Jacob VanLenten, docket No. 2142-15; Vincent J. Jacob and Marjorie B. Jacob, docket No. 2143-15; and Robert E. Jacob and Mary Ann Jacob, docket No. 2182-15.

[*2]        MEMORANDUM FINDINGS OF FACT AND OPINION


RUWE, Judge:  These cases were consolidated for purposes of trial, briefing, and opinion.  The Commissioner determined deficiencies in petitioners' Federal income tax and accuracy-related penalties under section 6662(a) as follows:[2]

Docket No. 2140-15--Syzygy Insurance Co., Inc.

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|-----------------------|
| 2009 | $149,147 | $29,829.40 |
| 2010 | 149,248 | 29,849.60 |
| 2011 | 105,502 | 21,100.00 |

Docket No. 2141-15--John W. and Melinda L. Jacob

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|-----------------------|
| 2009 | $71,985 | $14,397.00 |
| 2010 | 62,362 | 12,472.40 |
| 2011 | 41,779 | 8,335.80 |

------

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] Docket No. 2142-15--Michael and Elizabeth Jacob VanLenten

| Year | Deficiency | Penalty sec. 6662(a) |
|------|------------|----------------------|
| 2009 | $71,985 | $14,397.00 |
| 2010 | 62,362 | 12,472.40 |
| 2011 | 41,779 | 8,355.80 |

Docket No. 2143-15--Vincent J. and Marjorie B. Jacob

| Year | Deficiency | Penalty sec. 6662(a) |
|------|------------|----------------------|
| 2009 | $31,414 | $6,283.80 |
| 2010 | 32,189 | 6,437.80 |
| 2011 | 14,806 | 2,962.20 |

Docket No. 2182-15--Robert E. and Mary Ann Jacob

| Year | Deficiency | Penalty sec. 6662(a) |
|------|------------|----------------------|
| 2009 | $31,414 | $6,282.80 |
| 2010 | 26,934 | 5,386.80 |
| 2011 | 18,508 | 3,701.60 |

The issues for decision are: (1) whether payments through a microcaptive insurance arrangement from Highland Tank & Manufacturing Co. (Highland Tank) and its affiliates to Syzygy Insurance Co., Inc. (Syzygy), and its fronting carriers are deductible as insurance premiums; (2) whether Syzygy's section 831(b) election is invalid for the years in issue; (3) whether the purported premium

[*4] payments are otherwise included in Syzygy's income if we find the arrangement is not insurance; and (4) whether petitioners are liable for accuracy-related penalties for the years in issue.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first amended, first supplemental, and second supplemental stipulations of facts and the attached exhibits are incorporated herein by this reference. Syzygy's principal place of business was in Pennsylvania when it filed its petition, and all individual petitioners resided in Pennsylvania when they filed their petitions.

Petitioners

Syzygy is a microcaptive insurance company established by John W. Jacob and Michael VanLenten. John W. Jacob is married to Melinda L. Jacob and is Highland Tank's chairman of the board, secretary, treasurer, and a vice president. He is responsible for Highland Tank's overall management. John W. Jacob's parents are Robert and Mary Ann Jacob.

Mr. VanLenten is married to Elizabeth Jacob VanLenten and is Highland Tank's president. Mrs. VanLenten is John W. Jacob's first cousin. Her father is Vincent J. Jacob, who is married to Marjorie B. Jacob.

**[*5]** <u>HT&A</u>

Highland Tank is a family business based in Stoystown, Pennsylvania, that manufactures above-ground and below-ground steel tanks. Highland Tank has been owned by the Jacob family since 1953. Various related companies have formed under the Highland Tank umbrella, including Highland Tank of New York, Inc. (HTNY), Highland Tank of North Carolina, Inc. (HTNC), Lowe Engineering Co., Inc. (Lowe), and Bigbee Steel & Tank Co. (Bigbee).[3] For all of the years in issue each company elected to be treated as an S corporation for Federal income tax purposes.[4] HT&A had approximately 400 employees at six different locations and during the years in issue had annual revenues of between $54,138,272 and $61,086,066.

During all of the years in issue Bigbee was owned 50% by the John W. Jacob 2002 Irrevocable Trust (2002 Jacob Trust) and 50% by the Michael and Elizabeth VanLenten 2002 Irrevocable Trust (2002 VanLenten Trust). In 2009

---

[3]Highland Tank, HTNY, HTNC, Lowe, and Bigbee will sometimes be collectively referred to as HT&A.

[4]An S corporation is a corporation governed under the laws of subchapter S of the Code. S corporations are not generally subject to Federal income tax but like partnerships are conduits through which income flows to their shareholders. <u>See</u> <u>Gitlitz v. Commissioner</u>, 531 U.S. 206, 209 (2001) ("Subchapter S allows shareholders of qualified corporations to elect a 'pass-through' taxation system under which income is subjected to only one level of taxation.")

**[*6]** John W. Jacob and Mr. VanLenten each owned 50% of the remaining HT&A entities. The ownership structure of those entities changed in 2010, and each were owned: (1) 33.3% by John W. Jacob; (2) 16.7% by the 2008 John W. Jacob, Sr., Separate Trust (2008 Jacob Trust); (3) 33.3% by Michael VanLenten; and (4) 16.7% by the 2008 Michael and Elizabeth J. VanLenten Separate Trust (2008 VanLenten Trust). In 2011 those same entities were owned 50% by the 2008 Jacob Trust and 50% by the 2008 VanLenten Trust.

Robert Jacob was the grantor of the 2002 Jacob Trust, Vincent Jacob was the grantor of the 2002 VanLenten Trust, John W. Jacob was the grantor of the 2008 Jacob Trust, and Mr. VanLenten was the grantor of the 2008 VanLenten Trust. Each trust was a grantor trust and its income was taxable to the grantor.

HT&A's Commercial Insurance Coverage

John W. Jacob has considerable experience with insurance. He sits on the board of directors of Columbus Captive Insurance and the Luttner Financial Group (a general agent for Guardian Life Insurance).

HT&A had extensive commercial insurance coverage. During each year in issue they maintained between 11 and 13 policies and paid premiums of between $981,882 and $1,471,042. The average rate-on-line for all of HT&A's

[*7] commercial insurance policies was 1.14% as calculated by the Commissioner's expert.[5]

Formation of Syzygy

In 2008 John W. Jacob explored forming a captive insurance company. Seubert & Associates, an insurance broker, eventually connected John W. Jacob with Alta Holdings, LLC (Alta). Alta, a company based in Irvine, California, ran a captive insurance program and provided management services for captive insurance companies.[6]

Throughout 2008 Alta and John W. Jacob had multiple discussions about forming a captive insurance company. Emanuel DiNatale, a certified public accountant (C.P.A.) and then partner of Alpern Rosenthal, who advised HT&A on tax and business matters, participated in some of these meetings.[7] On October 2, 2018, Alta regional director Brian Flinchum held a webinar with Mr. Jacob and Mr. DiNatale. One version of the agenda for the meeting stated that a captive

---

[5]Rate-on-line is an insurance policy's premium divided by the occurrence limit.

[6]Alta was owned 90% by Bruce J. Molnar, 5% by Donald B. Rousso, and 5% by Greg Taylor.

[7]Mr. DiNatale is now a partner of BDO, which is Alpern Rosenthal's successor.

[*8] insurance company is not feasible unless there are at least $600,000 of annual premiums and that Alta had identified that amount and needed more information on how much more premium was achievable.

On November 26, 2008, Alta's chief underwriter, Greg Taylor, sent an email to another Alta employee saying that as a "will ass guess" he identified $500,000 to $800,000 of premiums. Sometime thereafter, Mr. DiNatale advised John W. Jacob that he should consider proceeding with a captive insurance company. Mr. DiNatale testified that he felt that the arrangement complied with the revenue laws and was appropriate from a business perspective. On December 5, 2008, John W. Jacob decided to proceed.

On December 15, 2008, Syzygy was incorporated in Delaware, and on December 31, 2008, it received from the State of Delaware Department of Insurance (DDI) a certificate of authority. Syzygy was initially capitalized with a $250,000 irrevocable letter of credit naming the DDI as the beneficiary. Syzygy was owned 50% by MV Investment Management (MV), LLC, and 50% by MJ Investment Management (MJ), LLC. MV's sole owner was the 2008 VanLenten Trust, and Mr. VanLenten was its manager. MJ's sole owner was the 2008 Jacob Trust, and John W. Jacob was its manager. Syzygy's only officers were Mr.

[*9] VanLenten and John W. Jacob. Mr. VanLenten was president, and John W. Jacob was secretary and treasurer.

Operation of Alta's Captive Program and Syzygy's Participation

Syzygy and HT&A participated in Alta's captive insurance program. Participants in Alta's program consisted of companies purchasing captive insurance and their related captive insurance companies. Typically, participants did not directly purchase policies from their captive insurance companies but from fronting carriers[8] related to Alta. From 2008 until December 31, 2010, the fronting carrier was U.S. Risk Associates Insurance Co. (SPC), Ltd. (U.S. Risk). From the end of 2010 until the end of 2011, Newport Re, Inc. (Newport Re), acted as the fronting carrier.

The fronting carriers' policies were written on behalf of their segregated portfolios. The policies issued by the fronting carriers had a maximum aggregate benefit of $1 million. Syzygy directly wrote one policy to HT&A for 2011, which

---

[8]Fronting companies issue fronting policies, which are "a risk management technique in which an insurer underwrites a policy to cover a specific risk but then cedes the risk to a reinsurer." Hanover Ins. Co. v. Urban Outfitters, Inc., 806 F.3d 761, 764 n.3 (3d Cir. 2015).

[*10] also had an aggregate maximum benefit of $1 million. All of the policies had a 12-month term and were claims-made policies.[9]

HT&A paid premiums directly to the fronting carriers, but the fronting carriers ceded 100% of the insurance risk. Each fronting carrier charged a fronting fee, which was deducted from the gross premiums HT&A paid to the fronting carrier. U.S. Risk charged 2.5% of the gross premiums paid, but it is unclear what NewPort Re charged.[10] The responsibility for paying a covered claim can best be understood as a two-layered arrangement. The first $250,000 of a single loss was allocated to layer 1, and any loss between $250,000 and $1 million was allocated to layer 2.

Alta uniformly allocated 49% of each captive participant's premiums to layer 1 and 51% to layer 2. Syzygy reinsured the first $250,000 of any HT&A

---

[9]A claims-made policy is "[a]n agreement to indemnify against all claims made during a specific period, regardless of when the incidents that gave rise to the claims occurred." Black's Law Dictionary 821 (8th ed. 2004).

[10]In the participation agreement among Syzygy, HT&A, and Newport Re the stated fronting fee was 3.5% of the gross premiums. But it appears that Newport Re deducted only 2.5% of the gross premiums paid by HT&A.

[*11] claim (layer 1 claims).[11]  Shortly after the fronting carriers received HT&A's premiums, they ceded 49% of the net premiums to Syzygy.[12]

For HT&A's claims between $250,000 and $1 million (layer 2 claims), Syzygy agreed to reinsure its quota-share percentage of losses.  The quota share was the ratio of:  (1) the net premium HT&A paid to that portfolio to (2) the aggregate net premiums the portfolio received for the insurance period. Additionally, Syzygy provided layer 2 reinsurance for a diverse array of approximately 857 policies issued to unrelated companies in the fronting carriers' pools.  Syzygy reinsured approximately 40 to 50 unrelated companies per pool.

---

[11]In Trans City Life Ins. Co. v. Commissioner, 106 T.C. 274, 278 (1996), we explained:

> Reinsurance is an agreement between an initial insurer (the ceding company) and a second insurer (the reinsurer), under which the ceding company passes to the reinsurer some or all of the risks that the ceding company assumes through the direct underwriting of insurance policies.  Generally, the ceding company and the reinsurer share profits from the reinsured policies, and the reinsurer agrees to reimburse the ceding company for some of the claims that the ceding company pays on those policies.

[12]The net premiums were the gross premiums paid by HT&A to the fronting carriers less the fronting fees.

[*12] Three and one-half months after the policy periods ended, the fronting carriers ceded the remaining 51% of net premiums to Syzygy less the amount of any claims paid for layer 2 losses.

During the years in issue HT&A paid gross premiums to the fronting carriers and the fronting carriers ceded net premiums to Syzygy as follows:

| Tax year | Gross premiums paid to fronting carrier | Fronting fee | Layer 1 net premiums ceded to Syzygy | Layer 2 net premiums ceded to Syzygy |
|---|---|---|---|---|
| 2009 | $510,000 | $12,750 | $243,652.50 | $253,597.50 |
| 2010[1] | 545,000 | 13,625 | 260,373.75 | 250,894.51 |
| 2011 | 318,500 | ([2]) | 152,163.38 | 158,374.12 |
| Total | 1,373,500 | 37,522 | 656,189.63 | 662,866.13 |

[1]For 2010 the net premiums and fronting fee do not add up to the gross premiums paid by HT&A because Syzygy contributed $20,106.74 to a layer 2 claim, which is discussed later in the opinion.
[2]The record is conflicted as to how much HT&A was charged as a fronting fee for 2011.

Allocation of Premiums Between Layers 1 and 2

Alta requested that Taylor-Walker & Associates, Inc. (Taylor-Walker), an actuarial consulting firm based in Midvale, Utah, provide input regarding the

**[*13]** allocation of premiums between Layers 1 and 2.[13]  Randall Ross, an

associate of the Casualty Actuarial Society and a member of the American

Academy of Actuaries, worked on the request.  In response to Alta's request, Mr.

Ross sent an email on April 25, 2007, to Alta's chief financial officer, stating:

> We reviewed various industry indications and simulated
> distributions to determine the reasonableness of the proposed split
> between the primary layer ($0-$250,000) and the excess layer
> ($250,000-$1,000,000).  Based on our review, we would expect more
> than 49% of the loss experience to fall in the primary layer, given the
> proposed limits.
>
> Our review of industry experience by layer suggests that a
> reasonable portion of experience to attribute to the primary layer
> might range from roughly 57% to 78%, depending on the type of
> coverage offered.  However, we did find one medical malpractice
> liability increased limits factor that implied a 47%/53% breakdown
> into the respective layers.
>
> Additionally, we attempted to model loss experience in such a
> manner that would support the proposed split of 49%/51% * * *.  In
> order to achieve such a split, we determined that we would have to
> assume an average unlimited claim size in excess of $500,000.  While
> some claims can be expected to exceed this amount, we would expect
> the average severity over all claims to be significantly lower.
>
> We note that the proposed split between primary and excess
> experience may be more easily supported by either lowering the

---

[13]It is unclear when Alta made the request, but the Commissioner claims that it was in 2007.

**[*14]** attachment point to something below $250,000 or increasing the limit to something greater than $1 million.[14]

On May 16, 2007, Mr. Ross sent Alta another email estimating that 70% of the losses would occur in layer 1 and 30% in layer 2.

Alta did not change the premium allocation in response to Mr. Ross' findings. Mr. Ross was unaware of why Alta allocated 49% of premiums to layer 1 and 51% to layer 2 and never asked. John W. Jacob testified that the purpose of the allocation was to take advantage of a tax-related "safe harbor".[15]

Policies and Premiums

Although John W. Jacob testified that the original intent behind forming a captive insurance company was to obtain coverage for potential warranty claims, HT&A did not purchase a captive warranty policy for the years in issue.[16] For 2009 and 2010 U.S. Risk issued HT&A the following policies:[17]

---

[14]Mr. Ross testified that as discussed in the email, the "primary layer" is layer 1, and it is clear from his testimony that the "excess layer" is layer 2.

[15]The safe harbor is almost certainly Rev. Rul. 2002-89, 2002-2 C.B. 984.

[16]Highland Tank did purchase warranty insurance for 2012.

[17]The policies issued for 2009, 2010, and 2011 were in effect, respectively, from December 31, 2008, to December 31, 2009; December 31, 2009, to December 31, 2010; and December 31, 2010, to December 31, 2011.

| [*15] Policy type | 2009 premium | 2010 premium |
|---|---|---|
| Administrative actions | ([1]) | $50,000 |
| Bankruptcy preference | $25,000 | 40,000 |
| Cyber liability | 25,000 | 25,000 |
| Deductible reimbursement | 250,000 | 250,000 |
| Legal expense | 50,000 | 40,000 |
| Intellectual property defense | 25,000 | 25,000 |
| Intellectual property enforcement | 50,000 | 40,000 |
| Property DIC[2] | 85,000 | 75,000 |
| Total premiums | 510,000 | 545,000 |

[1]HT&A did not procure an administrative actions policy for 2009.
[2]DIC means "difference in conditions".

For 2011 Syzygy directly wrote the intellectual property enforcement policy to HT&A. HT&A procured the following policies from Newport Re for 2011:

[*16]

| Policy type | 2011 premium |
| --- | --- |
| Administrative actions | $25,000 |
| Bankruptcy preference | 20,000 |
| Cyber liability | 20,000 |
| Deductible reimbursement | 162,500 |
| Legal expense | 26,000 |
| Intellectual property | 20,000 |
| Property DIC | 45,000 |
| Total premiums | 318,500 |

Excluding HT&A's life, health, and workers' compensation policies, the deductible reimbursement policies had the third highest premiums of any HT&A policy procured for 2009 and 2010 and the fourth highest for 2011. The legal expense, intellectual property, intellectual property enforcement, administrative actions, and property DIC policies were excess-coverage policies, under which the insurer agreed to indemnify against a loss only if it exceeded the amount covered by another policy. The policies did not provide for pro rata refunds if they were canceled during the policy terms. Claims could be made only within seven days after the policy period closed, and there was no option to purchase an extended claims reporting period.

**[\*17]** The premiums for the 2009 policies were set by Mr. Taylor, who is not an actuary. Before Mr. Taylor set the premiums, HT&A provided Alta with a series of answers to underwriting questionnaires and accompanying documents. Mr. Taylor then created an underwriting report recommending premiums for 2009, which is dated December 9, 2008. It appears that Mr. Taylor relied on the information provided by HT&A. However, the underwriting report does not detail Mr. Taylor's rating model, calculations, or any other detailed analysis describing how he arrived at the premiums. The report provided only general information about projected losses, previous claims, and information about HT&A's other insurance. There is nothing in the underwriting report that suggests that Mr. Taylor used comparable premium information to price the premiums.

Alta hired Taylor-Walker to create an actuarial feasibility study for Syzygy.[18] The feasibility study was prepared in support of Syzygy's captive insurance application. Mr. Ross prepared and cosigned the feasibility study, which is dated December 15, 2008. The feasibility study mentions the premium prices, but its primary purpose was to determine Syzygy's ability to remain solvent, not to determine whether the premiums were reasonable.

---

[18]Greg Taylor did not have an ownership interest in Taylor-Walker.

[*18] Mr. Ross testified that he did not have a role in pricing the premiums and did not look at publicly available State rating models when preparing the feasibility study. With respect to the premiums the study states that Syzygy's "selected premium levels appear to be somewhat conservative in relationship to the insured risks and policy limits * * *. For this reason, it is our opinion that * * * [Syzygy] is feasible from a financial solvency perspective." Mr. Ross testified that conservative meant "not too low."

In preparing the report Mr. Ross did not use any independent data but only data provided by Alta. The report goes on to state:

> We accepted, without audit, the premium and loss assumptions provided to us. It is our opinion that these assumptions represent the best available information from which to project losses and premiums for the Captive. We reviewed these assumptions for reasonableness and consistency. However, we acknowledge that these assumptions are highly subjective.

After Syzygy submitted its application, a DDI contractor performed an initial examination of Syzygy that offered no recommendations. The initial examination included an actuarial review. William White, director of captive insurance for the DDI during Syzygy's application process and the actuarial review, testified that the actuarial review focused on whether the premiums were sufficient for Syzygy to remain solvent and that the DDI was unconcerned with premiums being too

[*19] high.  The initial report sheds no light on whether the contractor evaluated the reasonableness of Syzygy's premiums.

The parties' experts calculated an average rate-on-line of 6.08% to 6.2% for HT&A's captive insurance policies during the years in issue.  Neither U.S. Risk nor Newport Re timely issued a policy to HT&A during the years in issue. Newport Re did not issue policies until after the policy years ended.

Projected Losses and Claims

Alta's underwriting report projected that Syzygy would pay annual layer 1 claims under the legal expense, property difference in condition, and deductible reimbursement policies.  The feasability study projected that Syzygy would have an overall loss and loss adjustment expense (LLAE) ratio of 56% overall and 29% in layer 2 from 2008 to 2012.[19]  Syzygy's actual LLAE ratio was 1.5%.  The LLAE ratio was 0% for layer 1 and 3% for layer 2.

HT&A did not file any claims under their captive program policies during the years in issue but did file multiple claims under their commercial insurance policies and incurred deductibles.  In response to Alta's underwriting questionnaires, HT&A stated that they did not keep specific records of the

---

[19]The LLAE ratio is the cost of losses and loss adjustment expenses divided by the total premiums.  The feasability study did not provide a specific LLAE ratio for layer 1.

[*20] incurred deductibles they paid because the deductibles were "too numerous to list."  Although the deductible reimbursement policies issued by U.S. Risk for 2009 and 2010 state that they applied only to one specific policy--STICO policy No. PLR0009-04--John W. Jacob testified that all deductibles were covered except for workers' compensation and health insurance.  From 2009 to 2010 HT&A made payments for a $56,012.58 deductible resulting from a claim filed under STICO policy No. PLR0009-04.  Petitioners do not dispute that coverage was available for an additional $43,456.08 of deductibles paid or incurred during the years in issue.

John W. Jacob spent significant time working on HT&A's insurance matters during the years in issue.  He testified that he did not file captive program claims because of time management issues and that they did not hit his "radar screen".  John W. Jacob acknowledged that HT&A did not have a claims management system in place for their captive program but had "different processes" in place depending on the claim for their commercial policies.

Syzygy paid $20,106.74 to satisfy its quota-share responsibility of an approximately $1,483,889 layer 2 claim in 2010.[20]  The claim was filed by

---

[20]U.S. Risk withheld $20,106.74 from the layer 2 net premiums ceded to Syzygy for 2010.

[*21] Pyrotek, Inc. (Pyrotek), under an intellectual property policy for the period of June 30, 2009, to June 30, 2010. It is unlikely that the loss was covered, but U.S. Risk settled the claim.[21] Syzygy did not investigate whether the loss was covered.

Syzygy's Capitalization and Assets

Syzygy met Delaware's minimum capitalization requirements during the years in issue. Syzygy was initially capitalized with a $250,000 irrevocable letter of credit of which the DDI was the beneficiary.[22] Syzygy's assets were listed on audited financial statements for each year in issue. By the end of 2009 Syzygy's listed assets totaled $1,218,713 and consisted of: (1) the $250,000 letter of credit, (2) $183,740 of cash and cash equivalents, and (3) $784,973 of unceded premiums. By the end of 2010 Syzygy's listed assets increased to $1,460,931 and consisted of: (1) the $250,000 letter of credit, (2) $349,500 of cash and cash equivalents, (3) $561,431 of unceded premiums, and (4) two life insurance policies worth $300,000. By the end of 2011 Syzygy's listed assets decreased to

_____

[21]According to Alta the claim was not covered because its was not timely reported and Pyrotek did not disclose the loss when the policy was written although it knew about the loss.

[22]The letter of credit was canceled in 2011, and it seems this was done with the consent of the DDI.

[*22] $1,136,389 and consisted of: (1) $45,395 of cash and cash equivalents, (2) $158,374 of unceded premiums, (3) a $250,000 certificate of deposit, (4) mutual funds holding bonds worth $79,436, and (5) two life insurance policies worth $603,184.

Syzygy did not own the life insurance policies listed on the financial statements. Rather, they were owned by the 2008 Jacob Trust and the 2008 VanLenten Trust.[23] Syzygy was not a beneficiary of either policy. The policies' respective beneficiaries were the trusts. On June 23, 2010, Matthew Michael Jacob was appointed as special investment adviser to the 2008 Jacob Trust and the 2008 VanLenten Trust. In his capacity as special investment adviser Matthew Michael Jacob had "the sole authority to direct the Trustee regarding all life insurance policies" on the lives of John W. Jacob and Mr. VanLenten.

On the same day of Matthew Michael Jacob's appointment as special investment adviser, Syzygy entered into separate split-dollar life insurance agreements with the respective trusts regarding the life insurance policies. Under the terms of the agreements, Syzygy agreed to pay premiums for a life insurance policy insuring John W. Jacob and a separate policy insuring Mr. VanLenten. The

---

[23]The policy insuring Mr. VanLenten's life lists the owner as Stewart Management Co. as trustee of the 2008 VanLenten Separate Trust.

[*23] policy insuring John W. Jacob's life had a face amount of $8,034,280, and the policy insuring Mr. VanLenten's life had a face amount of $7,356,547.

Syzygy's only rights to the policies' proceeds were defined in the split-dollar agreements. Upon the death of an insured, Syzygy was entitled to the greater of: (1) the premiums that it had paid with respect to the policy or (2) the policy's cash value. If the policy was terminated during the life of an insured, Syzygy was entitled to the total amount payable under the policy.

Syzygy was prohibited from accessing the cash values of the policies, borrowing against the policies, surrendering or canceling the policies, or taking "any other action with the respect to the polic[ies]." Syzygy and the trusts were allowed to assign their rights.

The agreements could be terminated only through the mutual consent of Syzygy, the respective insured, and the respective trust. Within 60 days of termination, the owner had the option to obtain a release of Syzygy's interest in the policy. To obtain the release, the policy owner was required to pay Syzygy the greater of: (1) the premiums that it paid with respect to the policy or (2) the policy's cash value. If the policy owner did not obtain a release, ownership of the policy reverted to Syzygy.

**[*24]** Syzygy paid $300,000 of premiums for the life insurance policies in both 2010 and 2011. Neither the policies nor the agreements were terminated during the years in issue.

## Syzygy's Exit From Alta's Captive Program

In 2011 Syzygy decided to exit Alta's captive insurance program. Syzygy's premiums dropped by more than $200,000 in 2011. John W. Jacob sent an email to Alta explaining that Syzygy was changing managers because, among other things, he was displeased with the decrease in premiums.

At trial John W. Jacob testified the he was disappointed in the premium decrease because there were fixed costs associated with a captive manager and it makes the most sense to have as much coverage as possible with the captive manager.

## Returns and Notices of Deficiency

Petitioners each filed returns for the years in issue. Syzygy made a section 831(b) election and reported no taxable income for any of the years in issue.

The premium payments to the fronting carriers were apportioned among the various entities under the Highland Tank umbrella, and the entities deducted those payments. Because HT&A were S corporations, the deductions flowed through to

[*25] the shareholders. The deductions that flowed through to the trusts were claimed by the trusts' grantors.

The Commissioner selected petitioners' returns for examination and timely issued notices of deficiency. With respect to Syzygy, the Commissioner determined that Syzygy did not engage in insurance transactions and was not an insurance company. Accordingly, the Commissioner determined that the section 831(b) election was invalid and the premiums Syzygy received were taxable income. The Commissioner also imposed accuracy-related penalties.

With respect to the individual petitioners, the Commissioner determined: (1) the arrangement was invalid for lack of economic substance, (2) the premium payments were not payments for insurance, and (3) the amounts deducted were not ordinary and necessary business expenses. Accordingly, the Commissioner disallowed the deductions and imposed accuracy-related penalties.[24]

Petitioners timely filed petitions with this Court.

---

[24]The notices of deficiency for 2009 issued to John W. Jacob and Melinda L. Jacob, and Michael VanLenten and Elizabeth Jacob VanLenten have a computational discrepancy that the parties do not explain. In the explanation of items portion of the notices, the Commissioner stated that he disallowed $268,307 of "Insurance Expenses" paid by Highland Tank. However, only $193,306.79 of the total premiums paid for 2009 was allocated to Highland Tank.

**[\*26]**                                          OPINION

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving that the determinations are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and taxpayers bear the burden of proving that they are entitled to any deduction claimed. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice, Co. v. Helvering, 292 U.S. 435, 440 (1934).

Under section 7491(a), if the taxpayer provides credible evidence concerning any factual issue relevant to ascertaining the taxpayer's liability and complies with certain other requirements, the burden of proof shifts to the Commissioner as to the factual issue. At trial on December 13, 2017, petitioners filed a motion to shift the burden of proof. On April 6, 2017, we issued a pretrial order requiring "[t]hat all motions to shift the burden of proof will be filed by September 22, 2017". Therefore, petitioners violated the pretrial order, and we will issue an order denying their motion to shift the burden of proof.

The issues we must decide are (1) whether the amounts received by Syzygy as premiums are excluded from its gross income and (2) whether the individual petitioners are entitled to the benefit of deductions taken by their S corporations

[*27] for insurance under section 162. Petitioners argue that the premiums received by Syzygy were payments for insurance and, therefore: (1) these premiums are excluded from Syzygy's income under section 831(b) and (2) the individual petitioners are entitled to deduct the premiums as payments for insurance under section 162.

The Commissioner argues that (1) the premiums Syzygy received were not insurance premiums and therefore are not excluded under section 831(b) and (2) the premium payments are not deductible under section 162 as payments for insurance.

We begin our discussion by briefly explaining the taxation and deductibility of microcaptive insurance payments. Insurance companies--other than life insurance companies--are generally taxed on their income in the same manner as other corporations. See secs. 11, 831(a). However, section 831(b) provides an alternative taxing structure for certain small insurance companies. During the years in issue, an insurance company with net written premiums (or, if greater, direct written premiums) that did not exceed $1.2 million for the year could elect to be taxed under section 831(b).[25] Sec. 831(b)(2). A small insurance company

---

[25]The 2015 amendments to sec. 831(b) increased the premium ceiling to $2.2 million--adjusted for inflation--and added new diversification requirements

(continued...)

[*28] that makes a valid section 831(b) election is subject to tax only on its investment income. Sec. 831(b)(1). These companies are not subject to tax on their earned premiums and are commonly referred to as "microcaptive" insurance companies. See sec. 831(b)(1).

Typically, amounts paid for insurance are deducible under section 162(a) as ordinary and necessary expenses paid or incurred in connection with a trade or business. Sec. 1.162-1(a), Income Tax Regs. Section 162(a) does not prohibit deductions for microcaptive insurance premiums.

An inherent requirement for a company to make a valid section 831(b) election is that it must transact in insurance. See Avrahami v. Commissioner, 149 T.C. 144 (2017). Likewise, the deductibility of insurance premiums depends on whether the premiums were truly payments for insurance. Thus, these cases hinge on whether the captive insurance arrangement meets the definition of insurance.

I. Whether the Arrangement Is Insurance

Neither the Code nor the regulations define insurance, and we are guided by caselaw in determining whether a transaction constitutes insurance for Federal

---

[25](...continued)
that an insurance company must meet to be eligible to make a sec. 831(b) election. See Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, sec. 333, 129 Stat. at 3106.

[*29] income tax purposes. Avrahami v. Commissioner, 149 T.C. at 174. Courts have looked to four criteria in deciding whether an arrangement constitutes insurance: (1) the arrangement involves insurable risks, (2) the arrangement shifts the risk of loss to the insurer, (3) the insurer distributes the risk among its policy holders, and (4) the arrangement is insurance in the commonly accepted sense. Harper Grp. v. Commissioner, 96 T.C. 45, 58 (1991), aff'd, 979 F.2d 1341 (9th Cir. 1992); AMERCO & Subs. v. Commissioner, 96 T.C. 18, 38 (1991), aff'd, 979 F.2d 162 (9th Cir. 1992). These four nonexclusive criteria establish a framework for determining the existence of insurance for Federal income tax purposes. AMERCO & Subs. v. Commissioner, 96 T.C. at 38. We consider all of the facts and circumstances in the light of the criteria outlined above. See Rent-A-Center, Inc. v. Commissioner, 142 T.C. 1, 13-14 (2014). We will first look at risk distribution.

A. Risk Distribution

Petitioners argue that Syzygy distributed risk by participating in the U.S. Risk and Newport Re captive insurance pools and reinsuring unrelated risks. Therefore, before we can decide whether Syzygy distributed risk through the fronting carriers, we must decide whether those carriers were bona fide insurance companies. See Avrahami v. Commissioner, 149 T.C. at 185 (citing Rent-A-

[*30] <u>Center, Inc. v. Commissioner</u>, 142 T.C. at 10).  In determining whether an entity is a bona fide insurance company, we have considered factors such as:

(1)     whether it was created for legitimate nontax reasons;

(2)     whether there was a circular flow of funds;

(3)     whether the entity faced actual and insurable risk;

(4)     whether the policies were arm's-length contracts;

(5)     whether the entity charged actuarially determined premiums;

(6)     whether comparable coverage was more expensive or even available;

(7)     whether it was subject to regulatory control and met minimum statutory requirements;

(8)     whether it was adequately capitalized; and

(9)     whether it paid claims from a separately maintained account.

<u>Id.</u>; <u>see</u> <u>Rent-A-Center, Inc. v. Commissioner</u>, 142 T.C. at 10-13.  Many of these factors are interrelated, and we will address those most relevant.

     1.  <u>Circular Flow of Funds</u>

Under the arrangements with the fronting carriers, HT&A paid premiums to the carriers.  The fronting carriers then reinsured all of the risk, making sure that Syzygy received reinsurance premiums equal to the net premiums paid by HT&A less Syzygy's liability for any layer 2 claims.  For the years in issue, this resulted

[*31] in HT&A's paying the fronting carriers $1,373,500 of gross premiums and the fronting carriers' ceding $1,319,055.76 of reinsurance premiums to Syzygy. In considering similar circumstances we have determined that "[w]hile not quite a complete loop, this arrangement looks suspiciously like a circular flow of funds." Avrahami v. Commissioner, 149 T.C. at 186; see also Reserve Mech. Corp. v. Commissioner, T.C. Memo. 2018-86, at *41 (quoting Avrahami v. Commissioner, 149 T.C. at 186).

## 2. Arm's-Length Contracts

HT&A's captive program policy premiums had an average rate-on-line of 6.08-6.2%, while the policies they purchased outside of the captive program had an average rate-on-line of 1.14%. This amounts to HT&A's paying upwards of five times more for their captive program policies than noncaptive program policies. A higher rate-on-line means that insurance coverage is more expensive per dollar of coverage. Thus, a higher rate-on-line leads to a greater deduction for premiums.

Various terms in the captive program policies indicate that HT&A should have paid less for the captive program policies than the noncaptive policies. During each year in issue at least half of HT&A's captive program policies were for excess coverage, which should result in a lower rate-on-line. See Avrahami v.

[*32] Commissioner, 149 T.C. at 187-188.  None of the captive program policies provided for a refund of premiums upon cancellation.  The Commissioner's expert, James Macdonald, explained in his expert report that this was unusual.  Petitioners argue that Mr. Macdonald conceded there are commercial policies with premiums earned at inception, but petitioners have not pointed to any of HT&A's noncaptive policies that does not provide for a refund of unearned premiums.  Of HT&A's noncaptive program policies that the Court looked at, each provides a refund for unearned premiums.

Each captive program policy also required claims to be filed within the earlier of 30 days after the loss was incurred or 7 days after the policy expired.  In these cases the problem centers on the seven-day period after the policy expired.  In his expert report, Mr. Macdonald explained that the seven-day reporting period "would not be acceptable in an arm's-length transaction because it simply does not allow enough time for a policyholder to become aware of an incident that may result in a formal claim."  At trial Mr. Macdonald testified that the claims-made policies typically provide a period of 30 to 60 days after a policy's expiration to report claims for no additional premium.  Petitioners argue that Mr. Macdonald conceded that there are commercial claims-made insurance policies with shorter reporting periods than HT&A's, but petitioners have not pointed to any of

**[*33]** HT&A's noncaptive program claims-made policies with a reporting period of seven days or less. Of the policies that the Court reviewed, none had a reporting period of less than 30 days.

Petitioners contend that the rate-on-line analysis is flawed because Mr. Macdonald testified at trial that he would never price a commercial policy premium by averaging an insured's other commercial policies. However, Mr. Macdonald did not use the average rate-on-line for HT&A's noncaptive program policies to properly price another individual policy; he used it to show that on average HT&A paid more for their captive program coverage than their noncaptive program coverage. Thus, we think the rate-on-line analysis is appropriate. There is nothing in the record that justifies why HT&A, on average, paid higher premiums for policies with more restrictive provisions than their commercial policies. The higher average rate-on-line coupled with the policies' restrictive provisions leads us to conclude that the policies were not arm's-length contracts.

Additionally, John W. Jacob's email to Alta stating that one of the reasons HT&A was leaving the Alta program was the decrease in premiums deepens our view that the policies were not arm's-length contracts. It is fair to assume that a purchaser of insurance would want the most coverage for the lowest premiums. In

[*34] an arm's-length negotiation, an insurance purchaser would want to negotiate lower premiums instead of higher premiums. Seemingly, the main advantage of paying higher premiums is to increase deductions. Therefore, the fact that John W. Jacob sought higher premiums leads us to believe that the contracts were not arm's-length contracts but were aimed at increasing deductions.

### 3. Actuarially Determined Premiums

Neither the Code, caselaw, nor regulations define "actuarially determined" premiums in the context of captive insurance, but our cases have provided some guidance. We have held that premiums charged by a captive insurance company were actuarially determined when the company relied on an outside consultant's "reliable and professionally produced and competent actuarial studies" to set premiums, and we have looked favorably upon an outside actuary's determining premiums to be reasonable. Rent-A-Center, Inc. v. Commissioner, 142 T.C. at 27 (Buch, J., concurring) (noting that premiums were actuarially determined when set in reliance on an actuarial study); see Securitas Holdings, Inc. v. Commissioner, T.C. Memo. 2014-225. We have held that premiums were not actuarially determined when there has been no evidence to support the calculation of premiums and when the purpose of premium pricing has been to fit squarely within the limits of section 831(b). See Avrahami v. Commissioner, 149 T.C. at

[*35] 196; Reserve Mech. Corp. v. Commissioner, at *43.  In the instant cases, there are two issues with respect to actuarially determined premiums:  (1) the reasonableness of captive program premiums and (2) the 49% to 51% allocation of premiums between layer 1 and layer 2.  We will begin by discussing the first issue.

The only detailed evidence in the record relevant to how the premiums were set concerns the 2008 premiums.  Petitioners argue that the premiums were actuarially determined because they were set by Mr. Taylor using "a quantitative risk analysis", and then Mr. Ross reviewed the premiums and loss assumptions.  Further, they contend that the premiums were reviewed by actuaries contracted by the DDI.  We disagree.

Mr. Taylor is not an actuary.  We recognize that premiums can be set by nonactuaries, but Mr. Taylor's underwriting report has no calculations showing how he arrived at the premium prices.  Mr. Taylor does not appear to have used any type of actuarial rating model or compared premium prices with similar publicly available policies.  As stated by Mr. Taylor, he was using a "will ass guess" at one point during the pricing process.

Petitioners' argument that the actuarial reviews by Mr. Ross and the DDI-contracted actuaries prove that the premiums were actuarially determined is not supported by the record.  Mr. Ross testified that he reviewed the premiums in the

[*36] context of Syzygy's solvency and that the purpose of the review was not to determine whether the premiums were reasonable. Additionally, the director of captive insurance for the DDI during Syzygy's application process testified that the main purpose of the DDI actuarial review was also to determine Syzygy's solvency. There is nothing in the DDI initial examination report that indicates that the examination focused on whether the premiums were reasonable. Accordingly, the policies issued by the fronting carriers did not have actuarially determined premiums.

There are also problems with the allocation of premiums between layer 1 and layer 2. Mr. Ross sent two emails to Alta stating that the majority of the premiums should be allocated to layer 1, but Alta did not change the allocation. John W. Jacob testified that he understood that the purpose of the allocation was to take advantage of a tax-related safe harbor. As in Avrahami and Reserve Mech. Corp., we are concerned with one-size-fits-all approaches. See Avrahami v. Commissioner, 149 T.C. at 186; Reserve Mech. Corp. v. Commissioner, at *43. Accordingly, we find that the allocation of premiums between layer 1 and layer 2 was not actuarially determined.

All of the above-mentioned factors indicate that U.S. Risk and Newport Re were not bona fide insurance companies, which in turn means that they did not

[*37] issue insurance policies.  See Avrahami v. Commissioner, 149 T.C. at 190.

This means Syzygy's reinsurance of those policies did not distribute risk;

therefore, Syzygy did not accomplish sufficient risk distribution for Federal

income tax purposes through the fronting carriers.[26]

B.  Insurance in the Commonly Accepted Sense

Syzygy's absence of risk distribution by itself is enough to conclude that the

transactions among Syzygy, HT&A, and the fronting carriers were not insurance

transactions.  Avrahami v. Commissioner, 149 T.C. at 190.  But as an alternative

ground we can also look at whether the transactions constituted insurance in the

commonly accepted sense.  Id. at 191.  To determine whether an arrangement

constitutes insurance in the commonly accepted sense, we look at numerous

factors including:  (1) whether the company was organized, operated, and

regulated as an insurance company; (2) whether it was adequately capitalized;

(3) whether the policies were valid and binding; (4) whether premiums were

reasonable and the result of arm's-length transactions; and (5) whether claims

were paid.  R.V.I. Guar. Co. & Subs. v. Commissioner, 145 T.C. 209, 231 (2015);

---

[26]We have found as a fact that Syzygy wrote a single policy to HT&A for 2011.  See supra pp. 9-10.  We need not consider whether Syzygy achieved any type of risk distribution with respect to that policy because we conclude below that the arrangement is not insurance in the commonly accepted sense.

[*38] see Rent-A-Center, Inc. v. Commissioner, 142 T.C. at 24-25; Harper Grp. v. Commissioner, 96 T.C. at 60. We will address each of these factors in turn.

1. Organization, Operation, and Regulation

Syzygy was organized as an insurance company and regulated in the State of Delaware. The Commissioner, however, argues that Syzygy ran afoul of various insurance regulations. We will not address this as it does not affect the outcome of these cases. The important question is whether Syzygy was operated as an insurance company. In making this determination "we must look beyond the formalities and consider the realities of the purported insurance transactions". Hosp. Corp. of Am. v. Commissioner, T.C. Memo. 1997-482, 1997 WL 663283, at *24 (citing Malone & Hyde, Inc. v. Commissioner, 62 F.3d 835, 842-843 (6th Cir. 1995), rev'g T.C. Memo. 1989-604).

We have concerns with Syzygy's operation. The first problem is claims. During the years in issue HT&A did not submit a single claim to a fronting carrier or Syzygy. John W. Jacob testified that there were various claims that were eligible for coverage under the deductible reimbursement policy that were not submitted, and petitioners do not dispute that approximately $100,000 worth of claims was covered. Additionally John W. Jacob testified that HT&A had no claims process for the captive program claims but did have "different processes"

**[*39]** for their other claims. The deductible reimbursement policy was one of HT&A's most expensive insurance policies, and HT&A's failure to submit claims after paying deductibles is indicative of the arrangement's not constituting insurance in the commonly accepted sense. Our concern is bolstered by HT&A's statement on the underwriting questionnaire that before 2009 their incurred deductibles were "too numerous to list." Petitioners' contention that John W. Jacob was too busy to submit claims does not lead us to believe the arrangement was insurance in the commonly accepted sense because HT&A had claims processes for commercial policies that they did not implement for the captive program policies.

The problem with claims also extends to the sole claim Syzygy paid. It is unclear whether the claim was covered, yet Syzygy did not investigate coverage before paying the claim.

Syzygy's investment choices are also troubling. At the end of 2011 the life insurance policies insuring John W. Jacob and Mr. VanLenten totaled more than 50% of Syzygy's assets and were its largest investments. Under the terms of the split-dollar agreements, Syzygy could neither access the cash value of the policies, borrow against the policies, surrender or cancel the policies, nor unilaterally terminate the agreements with the trusts.

[*40] We do not think that an insurance company in the commonly accepted sense would invest more than 50% of its assets in an investment that it could not access to pay claims. The arrangement is even more troublesome because the 2008 Jacob Trust and the 2008 VanLenten Trust were the beneficiaries of the policies. If Syzygy needed to access the policies to pay a claim, it could not do so without the trusts' special investment adviser's consent. The special investment adviser would potentially be deterred from allowing Syzygy to access the policies because that would be detrimental to the respective trusts' beneficiaries' interests.

Petitioners contend that Steven Kinion--who has been director of captive insurance for the DDI since mid-2009--had no issues with the life insurance policies. However, Mr. Kinion's testimony is unclear as to whether he had knowledge of the terms of Syzygy's split-dollar agreements. When asked whether it was irrelevant that Syzygy could not access the policies' cash values, Mr. Kinion stated: "Once we became aware of these types of policies where a captive insurance company for instance could not access cash values, we would go to the captive manager * * * and seek out a change to those requirements." This does not amount to Mr. Kinion's having no issues with Syzygy's inability to access the policies' cash values to pay claims. We find that the circumstances surrounding

[*41] Syzygy's life insurance investments weigh heavily against Syzygy's being an insurance company in the commonly accepted sense.

Petitioners did not call any Alta employees as trial witnesses to explain how the insurance arrangement worked or discuss whether the fronting carriers operated in a bona fide fashion.

### 2. Capitalization

Syzygy met Delaware's minimum capitalization requirements. In Avrahami v. Commissioner, 149 T.C. at 194, we discussed how a consensus of our caselaw has held that an insurer is adequately capitalized if it meets the relevant jurisdiction's minimum capitalization requirements.

### 3. Valid and Binding Policies

The caselaw is not entirely clear on what makes a policy "valid and binding". We have held that policies were valid and binding when "[e]ach insurance policy identified the insured, contained an effective period for the policy, specified what was covered by the policy, stated the premium amount, and was signed by an authorized representative of the company." Securitas Holdings, Inc. v. Commissioner, at *28. In R.V.I. Guar. Co. v. Commissioner, 145 T.C. at 231, we found that policies were valid and binding when the insured filed claims for covered losses and the captive insurance company paid them. We have also

**[\*42]** looked at factors beyond whether the policies are simply binding such as conflicting policy terms and whether the policies were simply cookie cutter. Avrahami v. Commissioner, 149 T.C. at 194 (examining conflicting policy terms); Reserve Mech. Corp. v. Commissioner, at \*54 (describing that policies were cookie cutter and not necessarily appropriate).

Here the dispute surrounding valid and binding policies centers on whether the policies were timely issued, identified the insured, and specified what was covered by the policies. During the years in issue neither Syzygy nor the fronting carriers timely issued a policy to HT&A. The policies for 2009 and 2010 were not even issued until after the policy years ended. Despite the late issuances, petitioners contend that the risk binders issued by the fronting carriers bound coverage.[27] Although petitioners' expert Dr. Michael Angelina testified that late issuances are common in the insurance industry, we conclude that the failure to

---

[27]An insurance binder is a "written instrument, used when a policy cannot be immediately issued, to evidence that the insurance coverage attaches at a specified time and continues . . . until the policy is issued or the risk is declined and notice thereof is given." MDL Capital Mgmt. Inc. v. Fed. Ins. Co., 274 F. App'x 169, 170-171 (3d Cir. 2008) (quoting Harris v. Sachse, 52 A.2d 375, 378 (Pa. Super. Ct. 1947)).

There is no dispute that the binders for 2009 and 2010 were timely issued, but there is a dispute as to 2011.

**[*43]** timely issue even a single policy weighs against the arrangement being insurance in the commonly accepted sense.

The policies issued to HT&A have ambiguities and conflict as to whether HT&A were insured or whether only Highland Tank was insured. In response to informal discovery requests petitioners stated that Highland Tank, HTNY, HTNC, Lowe, and Bigbee were insured. The 2009 and 2010 policies name Highland Tank as the insured. But the risk binders for 2010 name Highland Tank's nominees, affiliates, and subsidiaries of affiliates as insureds.

There are also various ambiguities and conflicts concerning what the policies covered. For example John W. Jacob testified that the deductible reimbursement policies applied to all of HT&A's insurance policies except for workers' compensation and health insurance. The deductible reimbursement policies for 2009 and 2010 stated that they applied only to STICO insurance policy No. PLR00004-04. That STICO policy was not in effect in 2010. Additionally, the deductible reimbursement policy for 2011 stated that it applied to only five specific policies.

We recognize petitioners' argument that ambiguous policy terms are a major source of insurance litigation. Petitioners contend that regardless of the ambiguities and conflicting terms, the intent of the parties is controlling and the

**[*44]** policies are therefore binding.  The meaning of "valid and binding" for

Federal tax purposes also looks at policy ambiguities and conflicting terms and

how they fit in with the spirit of a transaction.  Obviously, ambiguous and

conflicting terms do not prevent every policy from being insurance for tax

purposes but related-party transactions are given heightened scrutiny.  Merck &

Co. v. United States, 652 F.3d 475, 481 (3d Cir. 2011) (citing Geftman v.

Commissioner, 154 F.3d 61, 75 (3d Cir. 1998), rev'g in part, vacating in part T.C.

Memo. 1996-447); Mazzei v. Commissioner, 150 T.C. __, __ (slip op. at 47)

(March 5, 2018).  Viewing the policies' late issuances, ambiguities, and

conflicting terms in the context of a related-party transaction leads us to conclude

that the valid and binding policies factor weighs against petitioners.

4.  Reasonableness of Premiums

As discussed in considering whether the policies were arm's-length

contracts, the premiums were unreasonable.  This factor weighs against

petitioners.

5.  Payment of Claims

The only claim submitted to Syzygy during the years in issue was the

Pyrotek layer 2 claim.  As discussed in connection with the "Organization,

Operation, and Regulation" factor, see supra pp. 38-39, the claim was paid, but

[*45] there are problems with the way that it was handled. This factor weighs slightly in petitioners' favor. But we do not regard this as overwhelming evidence that the arrangement constituted insurance in the commonly accepted sense because of the way the claim was handled.

Although Syzygy was organized and regulated as an insurance company, met Delaware's minimum capitalization requirements, and paid a claim, these insurance-like traits do not overcome the arrangement's other failings. Syzygy was not operated like an insurance company. The fronting carriers charged unreasonable premiums and late-issued policies with conflicting and ambiguous terms.

### C. Arrangement Not Insurance

The arrangement among HT&A, Syzygy, and the fronting carriers lacked risk distribution and was not insurance in the commonly accepted sense. Thus, the arrangement is not insurance for Federal income tax purposes and we need not address the Commissioner's economic substance arguments.

## II. Effect on Syzygy

Because the arrangement is not insurance, Syzygy's section 831(b) election is invalid and it must recognize the premiums it received as income. Therefore, we sustain the Commissioner's determinations with respect to Syzygy.

**[\*46]** III.  Effect on the Individual Petitioners

The individual petitioners cannot deduct the purported premium payments or any fees as payments for insurance because the payments were not for insurance.  Nevertheless, petitioners contend that the purported premium payments are payments for indemnification that are deductible as ordinary and necessary business expenses.  Additionally, they contend that the Commissioner argues against Rev. Rul. 2008-8, 2008-1 C.B. 340, and Rev. Rul. 2005-40, 2005-2 C.B. 4, by disallowing deductions for the purported premium payments.

A.  Deductibility as Indemnification Payments

There is little precedent addressing whether amounts paid for an invalid insurance arrangement can nevertheless be deductible under section 162(a), and neither party cites any cases.  To be deductible under section 162 an expense must be both ordinary and necessary.  Welch v. Helvering, 290 U.S. at 113.  An expense is necessary if it is appropriate and helpful to the development of the taxpayer's business.  Commissioner v. Tellier, 383 U.S. 687, 689 (1966); Welch v. Helvering, 290 U.S. at 113.  In the context of captive insurance there may be instances where noninsurance payments for indemnification protection might be appropriate and helpful to the development of the insured.  But, at the bare minimum, for such payments to be considered appropriate and helpful, the indemnified party must

[*47] intend to seek indemnification if a covered event occurs. Otherwise, there is no valid purpose for making such payments. In these cases HT&A's failure to file claims that they thought were covered under the deductible reimbursement policies leads us to find that there was no intent to seek indemnification for covered losses. Accordingly, the payments are not deductible as ordinary and necessary expenses.

B. The Revenue Rulings

Rev. Rul. 2005-40, 2005 2 C.B. at 5, states:[28]

> [A]n arrangement that purports to be an insurance contract but lacks the requisite risk distribution may instead be characterized as a deposit arrangement, a loan, a contribution to capital (to the extent of net value, if any), an indemnity arrangement that is not an insurance contract, or otherwise, based on the substance of the arrangement between the parties. The proper characterization of the arrangement may determine whether the issuer qualifies as an insurance company and whether amounts paid under the arrangement may be deductible.

The Commissioner is required to follow his revenue rulings, and we have treated revenue rulings as concessions by the Commissioner where those rulings are relevant to the disposition of a case. Rauenhorst v. Commissioner, 119 T.C. 157, 171-172 (2002). For a taxpayer to rely on a revenue ruling, however, the facts of the taxpayer's transaction must be substantially the same as those in the

---

[28]Rev. Rul. 2008-8, 2008-1 C.B. 340, 341, says nearly the same thing.

**[\*48]** ruling.  <u>Barnes Grp., Inc. & Subs. v. Commissioner</u>, T.C. Memo. 2013-109, at \*37-\*38, <u>aff'd</u>, 593 F. App'x 7 (2d Cir. 2014); sec. 601.601(d)(2)(v)(e), Statement of Procedural Rules.

Rev. Rul. 2008-8, <u>supra</u>, and Rev. Rul. 2005-40, <u>supra</u>, both describe circumstances where the Commissioner determined that various transactions either were or were not insurance.  With respect to those transactions that were not insurance, the Commissioner did not describe the precise characterization of the arrangements that were not insurance or the precise tax treatment of each characterization.  Thus, it is unclear how petitioners can rely on the revenue rulings to deduct the payments.  The rulings do not have substantially similar facts providing for a deduction for premium payments in relation to an arrangement that is not insurance.  Accordingly, petitioners cannot rely on the rulings to deduct the purported premiums.

Petitioners also argue that if the payments to Syzygy are not deductible they should not be taxable to Syzygy.  While the revenue rulings suggest the possibility that an arrangement that purports to be an insurance contract may instead be characterized as a deposit arrangement, a loan, a contribution to capital, or otherwise, there is no evidence that any such recharacterization is appropriate.  <u>See Reserve Mech. Corp. v. Commissioner</u>, at \*65-\*66.

**[\*49]** IV.  Penalties

In the notices of deficiency the Commissioner determined that petitioners were each liable for section 6662(a) accuracy-related penalties.  Section 6662(a) and (b)(1) and (2) authorizes a 20% penalty on the portion of an underpayment attributable to "[n]egligence or disregard of rules or regulations" and "[a]ny substantial understatement of income tax."  Negligence includes any failure to make a reasonable attempt to comply with the revenue laws, and "disregard of rules or regulations" includes any careless, reckless, or intentional disregard.  Sec. 6662(c).  Negligence is determined by testing a taxpayer's conduct against that of a reasonable, prudent person.  Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), aff'g 79 T.C. 714 (1982).  For individual taxpayers there is a substantial understatement of income tax if the amount of the understatement for the taxable year exceeds the greater of 10% of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).  For corporations there is an understatement of income tax if the amount of the understatement for the taxable year exceeds the lesser of 10% of the tax required to be shown on the return for the taxable year (or, if greater, $10,000) or $10 million.  Sec. 6662(d)(1)(B).

Under section 7491(c) the Commissioners bears the "burden of production" for penalties related to individual petitioners but not corporations.  NT, Inc. v.

[*50] Commissioner, 126 T.C. 191 (2006); Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Once the Commissioner meets his "burden of production", however, the "burden of proof" remains with the taxpayer, including the burden of proving the penalty is inappropriate because of reasonable cause under section 6664. See Rule 142(a); Higbee v. Commissioner 116 T.C. at 446, 448. We need not decide whether the Commissioner met his burden for the individual petitioners because they have established reasonable cause through good faith reliance on Mr. DiNatale's professional advice.

Section 6664(c)(1) provides that the penalty under section 6662(a) shall not apply to any portion of an underpayment if it is shown that there was reasonable cause for the taxpayer's position and he acted in good faith. See Higbee v. Commissioner, 116 T.C. at 448. This determination is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. For underpayments related to passthrough items we look at all pertinent facts and circumstances, including the taxpayer's own actions, as well as the actions of the passthrough entity. Sec. 1.6664-4(e), Income Tax Regs. Reliance on professional advice may constitute reasonable cause and good faith, but only if considering all the circumstances such reliance was reasonable. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), aff'd, 904

[*51] F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991); sec. 1.6664-4(b)(1), Income Tax Regs.

Reasonable cause exists if a taxpayer relies in good faith on the advice of a qualified tax adviser where the following three elements are present:  (1) the adviser was a competent professional who had sufficient expertise to justify the reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment.  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).  Reliance may be unreasonable if the adviser is a promoter of the transaction.  Id. at 98.  A promoter is "an adviser who participated in structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction."  106 Ltd. v. Commissioner, 136 T.C. 67, 79 (2011) (quoting Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121, slip op. at 47-48), aff'd, 684 F.3d 84 (D.C. Cir. 2012).

We find that Mr. DiNatale was a competent professional with sufficient expertise.  He is a C.P.A. who advises HT&A on tax and business matters.  His testimony strongly indicates that he familiarized himself with relevant captive insurance law when advising HT&A, and we credit his testimony.  Accordingly, we find that Mr. DiNatale was a competent professional with sufficient expertise.

[*52] We find that Mr. DiNatale was provided with all of the necessary and accurate information. He sat through meetings with John W. Jacob and Alta and was familiar with HT&A's business.

We find petitioners relied on Mr. DiNatale in good faith. Mr. DiNatale was not a promoter. In the context of microcaptive insurance, we have found a taxpayer's reliance on professional advice coupled with the lack of precedent in the area to be indicative of good faith. See Avrahami v. Commissioner, 149 T.C. at 207. Taking into account all of the facts and circumstances, the good faith reliance extends to all petitioners in these cases. Accordingly, petitioners are not liable for the accuracy-related penalties.

In reaching our decision, we have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

Decisions will be entered for respondent as to the deficiencies and for petitioners as to the accuracy-related penalties under section 6662(a).